**JAMES RICHARDSON & SONS, Limited, v. CONNERS MARINE CO., Inc.**

No. 239.

Circuit Court of Appeals, Second Circuit.

March 1, 1944.

Frank C. Mason, of New York City (Mahar & Mason, of New York City, on the brief), for respondent-appellant.

George B. Warburton, of New York City (Hill, Rivkins & Middleton, of New York City, on the brief), for libellant-appellee.

Before SWAN, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

This is a libel to recover damages to a number of cargoes of grain. On May 8, 1941, the parties contracted for the transportation by respondent from Buffalo to New York City of about 110,000 bushels of libellant's wheat, constituting the capacity of one fleet of barges. The following week, on May 17, 1941, a second agreement was reached for additional carriage by three fleets of barges, each loading about 128,000 bushels. Both of these contracts were made subject to the terms of the New York Produce Exchange Canal Grain Charter Party No. 1, which provided, among other things, for three days' free unloading time upon arrival in New York and for demurrage at the rate of four cents per ton per day after the expiration of the free time. It also granted the barge-owner the option of unloading immediately into a New York public elevator, provided that free lighterage outward was guaranteed; and in this event the charterer was to pay storage after the three-day period at the rate of one-twentieth of one cent per bushel per day. These rates were substantially different; thus for the smaller 600-ton barges, they amounted to $24 per day for demurrage, as against $9.75 for elevator storage.

Twenty-one barges in all were loaded at Buffalo between May 21, 1941, and July 17, 1941, and all reached New York Harbor within approximately fifteen days from the loading date. Upon arrival there, it was found that the Erie grain elevator had been destroyed by fire and that the Columbia Street elevator was filled to capacity. So the barges were moored at the canal terminal adjacent to the latter structure. Libellant had intended to load the grain immediately on outgoing vessels for shipment to England; but because of war conditions prevalent at that time further transportation was not immediately available, and due to the necessary secrecy surrounding convoy operations it was not able to ascertain definitely when the further movement of the grain would take place. Libellant's agent hence negotiated with respondent for an arrangement whereby the grain could be left on the barges at rates lower than the demurrage rates provided by the original contracts. Two agreements were finally reached by letters from respondent dated July 23, 1941, and August 5, 1941, which stipulated "to reduce the demurrage" to $20 per day for the larger barges and $15 per day for the smaller ones, provided that a minimum of twelve days' hire was to be paid in any event. The barges thus remained not unloaded at the Columbia Street terminal until various dates between October 14, 1941, and March 14, 1942, when transocean vessels were finally made available.

Upon the final transfer of the grain from the barges, it was found that extensive damage had resulted from contact with moisture or water and that some shortages also existed. The present libel was filed to recover the value of the grain lost in this manner. Respondent does not contest its liability for the shortages, as well it could not in view of the terms of the original contracts to the effect that official weight certificates covering the grain loaded on the barges were to be conclusive of the amount to be delivered on outturn and that respondent was to be liable for any difference, less an allowance of one-eighth of one per cent of intaken weight, at the market price of a like kind and grade of grain on the date of delivery. Nor is liability denied for damage to the cargoes of three barges due to holes in the tarpaulin covers or improper placement of hatch covers and for damage to the grain loaded on a fourth as the result of a collision with a dock at Buffalo. Respondent does allege, however, that there is no basis for admiralty jurisdiction and that there should be no liability except that specifically admitted as above.

The court below, over vigorous objections by respondent, first overruled exceptions to the libel, allowing, however, the question of jurisdiction to be renewed later. Then, after full trial, it concluded that there was admiralty jurisdiction. It adjudged the additional contracts of July 23 and August 5 to be maritime contracts for

reduced demurrage, rather than contracts of storage, since "the primary purpose of the libellant was the further transportation of the cargoes at an uncertain date in the future, and the demurrage was only incidental to that and to the original carriage." Then, on the merits, it rejected any claim for damage from weevils, but found the other damage to the grain in the seventeen barges under controversy to have been caused by seepage through the grain linings, tarpaulins, deck seams, and other leaks—all due to respondent's negligence and the unseaworthiness of the barges. It then entered an interlocutory judgment referring the matter to a commissioner for determination of the amount of libellant's loss. Respondent appeals from this judgment.

 Initially, the action of the court in overruling exceptions to the form of the libel is not reversible error. Respondent asserts that there should have been a separate statement of a separate cause of action as to each barge, because the Produce Exchange form stated that each boatload, or parcel if less than a boatload, was to be deemed a separate charter. Since it is now recognized that repetitive verbosity does not make for clarity, refinements of separate statement are not now in favor, Original Ballet Russe, Ltd., v. Ballet Theatre, Inc., 2 Cir., 133 F.2d 187; Federal Rules of Civil Procedure, rule 10(b), 28 U.S.C.A. following section 723c; and though a formal requirement of separation is still retained in the admiralty rules, yet it should be construed in a practical way. We cannot see any possible gain to respondent by forcing from 17 to 21 repetitions of the basic allegations; as to details of the damage, they are supplied by the answers to interrogatories, and the proceedings before the commissioner are hardly likely to move with such celerity as to deprive respondent of its proof through surprise.[1] Nor is the exception as to jurisdiction to be sustained merely on the form of the libel which refers to the agreements for the reduction in demurrage rates as agreements for the charter of the barges. The pleader was obviously attempting to state in sequence the events as they transpired, and not to pin legal labels on them, as, of course, was not his function. Moreover, the objection was renewed at trial by express permission of the court, at which time libellant's motion for amendment to conform to the proof was granted. The issue is, therefore, to be considered on the facts as they were found by the court.

 We see no reason to disturb the finding that libellant's primary purpose was the further transportation of the grain. True, such further transportation was to be by others than respondent. This point, however, is not an ultimate, rather an evidential, fact, bearing upon the controlling point, as to the intent of the parties and thus as to whether the later arrangement was properly incidental to the original agreement of navigation or was a new contract of warehousing. Thus, in the leading case of The Pulaski, D.C.E.D.Mich., 33 F. 383, 384, Judge, later Mr. Justice, Brown carefully distinguished between the practice "quite common upon the lakes" of winter storage of wheat upon vessels, the shipper finding "a convenient and cheap storage," and the vessel "a profitable employment during the idle season," and storage as "a mere incident to the transportation, as, for instance, if the wheat were taken on board with the understanding that the vessel should sail as soon as a tug or consort should be procured, or as soon as the ice should leave the harbor." The other cases relied on by respondent deal with this matter of winter storage and make this same distinction. The Richard Winslow, 7 Cir., 71 F. 426; The Milwaukee, D.C.W. D.N.Y., 15 F.2d 886; Pillsbury Flour Mills Co. v. Interlake S. S. Co., 2 Cir., 40 F.2d 439, certiorari denied 282 U.S. 845, 51 S.Ct. 24, 75 L.Ed. 750. Since Insurance Co. v. Dunham, 78 U.S. 1, 11 Wall. 1, 26, 20 L.Ed. 90, it has been settled that the criterion of admiralty jurisdiction as to contracts is whether the contract is maritime, "having reference to maritime service or maritime transactions." A contract intended to be of a temporary nature for adjustment of demurrage occasioned because of lack of shipping space to take over cargo as orig-

---

[1] So far as logic may be read into the concept "cause of action," there are ordinarily not more causes than there are agreements, or separate meetings of the minds of the parties. Compare Clark, Code Pleading (1928) 75–87, 318–329. The charter-party provision can be given other effect, e. g., in connection with res judicata, than as requiring undue formalism in pleading. Libellant has already gone far enough that way by making two repetitive statements of "causes," differing seemingly only in different theories of recovery.

inally planned properly, therefore, is one of maritime service. Compare The Jungshoved, 2 Cir., 290 F. 733, certiorari denied 263 U.S. 707, 44 S.Ct. 35, 68 L.Ed. 517; Hawn v. American S. S. Co., 2 Cir., 107 F. 2d 999, 1000; Hunt v. United States, D.C. S.D.N.Y., 17 F.Supp. 578, affirmed 2 Cir., 91 F.2d 1014, certiorari denied 302 U.S. 752, 58 S.Ct. 271, 82 L.Ed. 581; Robinson on Admiralty (1939) 162, 189–192.

Here obviously libellant hoped to push the grain along to England with the greatest expedition possible, and the only reason for the long delay was the unusual condition due to the war. The correspondence between the parties preliminary to the contracts of July 23 and August 5 emphasizes the temporary nature of the delay. Respondent specifically agreed "to reduce this demurrage," adding that the reduction was made "in view of the trouble you have had disposing of the grain laden in these boats, also in view of the fact that you are guaranteeing a minimum of hire period of twelve days for each boat." Surely if any sort of permanent storage had been contemplated, the main visible consideration for the supplementary contracts would not have been the twelve-day guarantee. And that was not an agreement to store for twelve days, but a gamble on the price turning on the uncertainty of the stay. Furthermore, respondent specifically stated: "As you know, we have done all in our power to help you, *due to the unforeseen delay in discharging.*" (Italics supplied.) And highly significant are the rates, which still remained much too high for simple storage, particularly if risk were to be placed upon the owner. Indeed, the rates thus set were only a reasonable compromise between the established demurrage and elevator charges provided for in the original charter-party form.

The oral testimony at the trial added little, if anything, to the import of the arrangement to be deduced from the general circumstances and the letters. While witness Herrmann for respondent testified that he told libellant's agent and grain broker, Connor, that he was assuming liability as charterer, Connor denied this belligerently on cross-examination, saying: "If he ever said that thing to me he would get it right back in his teeth." Later he said he had no recollection; and elsewhere he said, with reference to whether "storage" was involved, that it did not make a particle of difference to him "what you insist on, demurrage or storage. We are just an agent. We got the best terms we could." We think the court was justified in following the import of the letters, rather than reading some legal conclusion or admission into the views of this quite nonlegally bellicose individual.

Under the circumstances here present, the result contended for by respondent seems harsh, making it dangerous for a shipper to do the natural thing of seeking a reduction in demurrage rates for a stay somewhat beyond the usual, yet still clearly temporary in nature. Among the consequences would be those that he would find himself unexpectedly without the protection of his original charter, that he would be faced with splitting up his claim among two jurisdictions, and that he would have to divide his damage claims, if he could (which is perhaps doubtful in view of the nature of the available testimony) between the period up to July 23 and August 5 (the dates of the letters setting the new rates) and the period thereafter. Such compartmentalizing of litigation, to the mystification of lay observers, and waste in time and expense of litigants, is no longer tolerated as between jurisdiction in equity and law, and should not be encouraged as between admiralty and law. Compare, Morrison, The Remedial Powers of the Admiralty, 43 Yale L.J. 1, 18, 27; Robinson, op. cit. supra. Moreover, acceptance of respondent's contention would not lead to reversal and dismissal of the action, as it claims, but merely dismissal of the appeal (as allowable only from an *interlocutory* decree in admiralty, 28 U.S.C.A. § 227, Jud.Code § 129, as amended) and continuance of the action at law with the commissioner treated as a master under F.R.C.P. 53(a). For here all the facts showing diversity jurisdiction are presented, and it is well settled that under such circumstances an action shall be treated as within that jurisdiction where appropriate, even though it may have been commenced in admiralty. Moran Towing & Transportation Co. v. Navigazione Libera Triestina, S. A., 2 Cir., 92 F. 2d 37, 39, certiorari denied 302 U.S. 744, 58 S.Ct. 145, 82 L.Ed. 575; Admiral Oriental Line v. United States, 2 Cir., 86 F.2d 201, 203; Prince Line v. American Paper Exports, Inc., 2 Cir., 55 F.2d 1053; Cory Bros. & Co. v. United States, 2 Cir., 51 F. 2d 1010; Louis-Dreyfus v. Paterson Steamships, 2 Cir., 43 F.2d 824, 72 A.L.R. 242; Owens v. Breitung, 2 Cir., 270 F. 190;

United States ex rel. Pressprich & Son Co. v. James W. Elwell & Co., 2 Cir., 250 F. 939, certiorari denied 248 U.S. 564, 39 S.Ct. 8, 63 L.Ed. 423.[2]

 Respondent further contends that even granted admiralty jurisdiction, the findings below as to its liability should not be sustained. We cannot agree. Such findings in admiralty, as well as in civil actions, will not be disturbed upon appeal unless clearly erroneous, City of New York v. National Bulk Carriers, Inc., 2 Cir., 138 F.2d 826; Petterson Lighterage & Towing Corp. v. New York Cent. R. Co., 2 Cir., 126 F.2d 992; Kulukundis Shipping Co., S/A, v. Amtorg Trading Corp., 2 Cir., 126 F.2d 978; and there is ample evidence here pointing to damage to the grain from negligent unseaworthiness of the barges. The depositions of witnesses Korn and Stewart establish the good condition of the grain when it was loaded at Buffalo. The mere fact that they took only random samples, instead of specific samples of each 100 or 1,000 bushels loaded, is insufficient to overturn the conclusion below that the grain was in good condition when delivered to the carrier. Superimposing this, then, upon the admitted fact that the grain was damaged upon discharge by contact with moisture or water, the law of bailments places the burden of proof to explain the cause of the damage upon the carrier. Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 111, 62 S. Ct. 156, 86 L.Ed. 89. Since the parties can limit liability by the terms of their contract, however, and since the New York Produce Exchange form only holds the carrier for damage due to its negligence, it was only incumbent upon respondent to disprove negligence. But we do not feel that the court below acted erroneously in finding that respondent failed to meet this burden. The inspections of the barges at Buffalo were obviously cursory in nature, proving little beyond the reasonable cargoworthiness of the vessels. And libellant's

explanation of the damage as resulting from unseaworthiness between the light line and the loaded line and from clogging of the limber holes in the bottom of the barges is much more plausible than respondent's suggestion of inherent capillary attraction in the grain itself capable of drawing moisture through the sides of the barges and the sides of the grain linings.

Affirmed.

2 Had respondent duly claimed trial by jury, a further issue might then have arisen. Respondent's counsel stated at the argument that it did not want trial by jury; but in any event, it would have waived such trial by failure to make the claim seasonably. F.R.C.P. 38(b) and (d). So, even before the new rules, plaintiff was held to have waived jury trial by bringing his libel, United States ex rel. Pressprich & Son Co. v. James W. Elwell & Co., 2 Cir., 250 F. 939, certiorari denied 248 U.S. 564, 39 S.Ct. 8, 63 L.Ed. 423; and compare the similar situation as to law and equity claims, as discussed in Clark, The Union of Law and Equity, 25 Col.L.Rev. 1, 8; Clark, Code Pleading (1928) 67–71; cf. Barlow v. Scott, 24 N.Y. 40, 46; Williams v. Slote, 70 N.Y. 601; Hurwitz v. Hurwitz, App. D.C., 136 F.2d 796, 799.