MEFER S.A.R.L. OF PARIS,
FRANCE, Plaintiff,

v.

NAVIAGRO MARITIME
CORPORATION,
Defendant.

80 Civ. 2838 (JEL).

United States District Court,
S. D. New York.

Feb. 22, 1982.

Walker & Corsa, New York City, for defendant by William J. Blumenschein, John R. Keough, III, New York City.

Poles, Tublin, Patestides & Stratakis, New York City, for plaintiff by Theodore P. Daly, and Haight, Gardner, Poor & Havens, New York City; John J. Reilly, New York City, of counsel.

LUMBARD, Circuit Judge: *

In this case, two lawyers told the court that they had reached an agreement regarding an attachment proceeding, each one assuming that the other shared his understanding of the terms read into the record. This action for damages for breach of that alleged settlement agreement well illustrates the hazards of such assumptions.

On April 14, 1980, the plaintiff Mefer S.A.R.L. of Paris, France ("Mefer") sued defendant Naviagro Maritime Corp. ("Naviagro") to recover damages for breach of a charterparty. To secure that claim, it attached the defendant's vessel, the M/V Kostas Melas, while it was loading grain at Albany. Naviagro counterclaimed and moved to vacate the attachment. This action, brought as Naviagro's fifth counterclaim, alleges that Mefer breached an agreement reached in court to release the Kostas Melas from attachment in return for the deposit of stipulated security. By stipulation, all the other claims and counterclaims went to arbitration in London. Jurisdiction lies under 28 U.S.C. § 1333. The court finds that Mefer is bound by Naviagro's interpretation of the agreement for the release of the vessel and holds Mefer liable for damages for the breach of that agreement.

* Sitting by designation.

At a three day bench trial commencing on November 10, 1981, the court heard testimony from five witnesses. For Mefer appeared its manager, Nemr Diab, and its attorney during the settlement negotiations, John Reilly. Naviagro presented Eduardo Gonzalez, its secretary, George Vatistas, the manager of the Kostas Melas at the times in question, and Charles Trowbridge, its attorney for the settlement talks.

Mefer is a French corporation with its principal place of business in Paris, France. Its business is primarily brokerage in steel, metal, and fertilizers. Mefer frequently charters ocean-going vessels for transportation of such cargoes.

Diab has been the manager and a shareholder of Mefer since its organization in 1978, when he moved to Paris. Until then, he worked for his father in Lebanon, where he was involved in chartering vessels for the family's scrap and fertilizer export business. A Lebanese citizen, Diab speaks ten languages.

Naviagro, a Panamanian corporation, is the owner of the Kostas Melas. Gonzalez is a shareholder of Naviagro as well as its secretary. He is a citizen of Argentina and, at the times in question, was a resident of Washington, D. C. Gonzalez has a degree from the University of Argentina, and studied for two years at George Washington University.

The Navlos Maritime Co. managed the Kostas Melas under a management contract with Naviagro. Vatistas was an officer of Navlos Maritime Co. and was responsible for the day to day operations of the vessel. A native of Greece, Vatistas lived in New York from 1971 to 1981, when he returned to Greece to start his own shipping business. He presently has no connection with Naviagro or the Kostas Melas.

On September 19, 1979, Mefer chartered the Kostas Melas from Naviagro for the carriage of scrap from Buffalo to Alexandria, Egypt, with a second voyage at the charterer's option. The charter-party called for the charterer to pay the owner demurrage at the rate of $5,750.00 per day. At the conclusion of the first voyage, Naviagro claimed approximately $139,000 demurrage from Mefer, and Mefer claimed $209,000 demurrage from its receivers in Alexandria.

Although both parties agreed that Mefer was entitled to the demurrage from the receivers, Mefer was unable to collect directly from the receivers due to the quirks of Egyptian law, which requires that all money paid for expenses for the vessel and all funds received on behalf of the vessel be paid to one of the quasi-governmental bodies that act as official agents for vessels. Here, the charterer had nominated an organization called Abu Simbel as the official agent for the vessel and could only collect the demurrage from this agent.

However, as far as Abu Simbel was concerned, the demurrage belonged to the owner of the vessel, not the charterer. When the vessel completed discharging its cargo in Alexandria in mid-March, 1980, Mefer tried to collect from Abu Simbel the $209,-000 demurrage that the receivers owed it, but Abu Simbel refused to pay until it received notice from the vessel's owner that the owner had no claim on the money.

At that point, Mefer's representative in Alexandria, George Tannous, asked Vatistas to supply a letter to Abu Simbel stating that the owner had received the demurrage owed it and had no further claims. Vatistas refused to supply such a letter until Mefer paid to Naviagro the $139,000 demurrage that Naviagro claimed under the charterparty. On March 19, 1980, Naviagro notified Mefer by telex that it had given its bank a letter instructing Abu Simbel to release the demurrage money to Mefer, and added that this letter would be released to Mefer upon the full payment of the $139,-000 owed Naviagro under the charterparty. Mefer did not accept this offer.

Rather, Mefer responded, on March 25, 1980, by posting a letter of credit to Naviagro's account for $139,252.95 in the New England Merchants National Bank, payable upon the presentation of two documents: (1) a telex sent to Abu Simbel by Naviagro stating that the owner had received the full value of the demurrage in Alexandria and

irrevocably instructing Abu Simbel to pay the demurrage to Chemimetal, the charterer's affiliate in Paris, and (2) a written or telex confirmation from Abu Simbel to Mefer that the moneys would be paid without deduction.

Both Vatistas and Gonzalez told Mefer that the suggested conditions on the letter of credit were unacceptable, in particular the requirement that Naviagro supply a confirmation from Abu Simbel. Because he believed such a confirmation "would be, if not impossible, very, very hard to get[,]" Vatistas advised the owner not to agree to supply it. Gonzalez testified that he told the charterer that he would provide a telex to Abu Simbel instructing it to pay the demurrage to Mefer, but was unwilling to condition the release of the Kostas Melas on a confirmation from Abu Simbel that it would pay the $209,000 demurrage to Mefer without deduction. As Abu Simbel was an independent organization with which Naviagro had no contractual relations and over which it had no control, Gonzalez refused to promise to supply such a confirmation.

Diab testified that he wanted to receive the confirmation from Abu Simbel before releasing the $139,000 to Naviagro because he feared that Abu Simbel would deduct funds from the demurrage to pay for expenses incurred by the ship for which the owners were accountable. As official agent for the Kostas Melas, Abu Simbel could "guarantee on behalf of the owner to advance money to the master, to advance money to the tugboat, to advance money for any claims that they have in Egypt," according to Diab. It could then deduct the funds advanced against the demurrage, which, in Abu Simbel's eyes, belonged to the owner.

In the midst of these disputes over the demurrage, Naviagro refused to perform the second voyage called for under the charterparty. Mefer claimed that this refusal constituted a breach of the charterparty and demanded arbitration pursuant to the charterparty. On April 17, 1980, Mefer attached the Kostas Melas, which was then loading grain in Albany, to secure any recovery to be awarded by the London arbitrators on its damage claim of $500,000 (later amended to $600,000).

On the next day, April 18, Naviagro retained Charles Trowbridge of the firm of Walker & Corsa to represent it in connection with the attachment of the Kostas Melas. After meeting with Gonzalez, Trowbridge contacted the counsel for Mefer, John Reilly of the firm of Haight, Gardner, Poor & Havens, to attempt to negotiate an agreement regarding the security and countersecurity that each side would post so that the vessel could be released without court intervention. As Reilly and Trowbridge were unable to agree on terms for the release of the vessel, Trowbridge arranged a hearing on a motion to vacate the attachment for the following Monday afternoon, April 21, at 2:00 p. m., in Syracuse before Judge Munson of the Northern District of New York.

THE EVENTS IN SYRACUSE

At the hearing on April 21, Judge Munson told the parties that he was tied up with a trial and that they should make further efforts to settle their dispute. The parties and their lawyers then repaired to the corridors of the courthouse, where, for the rest of the afternoon and again the next morning, they negotiated informally. Participating at various times were Diab, representing Mefer, Gonzalez and Vatistas, representing Naviagro, and Trowbridge and Reilly.

The discussions on the afternoon of April 21 proved fruitless. The next morning, prior to the hearing on the motion to vacate the attachment, Trowbridge suggested to Reilly that Naviagro put up $300,000 security and that Mefer put up $200,000 countersecurity. Because Naviagro could not afford to bond the whole amount, Trowbridge proposed the following arrangement: Mefer would remove the $139,000 letter of credit then posted in the New England Merchants National Bank to the owner's account, but which the owner was unable to draw upon, and place it in an escrow account in London where it would be pay-

able to the prevailing party in the arbitration proceeding. Each party could therefore count this $139,000 against the security or countersecurity they were required to post. In addition, Mefer would put a $61,000 letter of credit and Naviagro would put up a $161,000 letter of credit.

After conferring with Diab, Reilly came back to Trowbridge and told him that this proposal was acceptable but Diab had two additional conditions. One was that Naviagro agree to an expeditious arbitration in London. The second condition, according to Trowbridge, was that "the defendant would have to give the plaintiff a letter required by the plaintiff to release demurrage moneys in Egypt that were owed by the receivers of the cargo."

Trowbridge testified that he relayed this counteroffer to Gonzalez and Vatistas who said they would agree to expedite the arbitration, but were concerned about the requirement for a "letter." They explained to Trowbridge that Diab had been seeking not only a letter from them to Abu Simbel instructing Abu Simbel to release the demurrage to Chemimetal but also a confirmation from Abu Simbel that the money would be paid without deductions. They told Trowbridge that they couldn't agree to condition the release of the ship on a communication from Abu Simbel, over whom they had no control. Trowbridge then told them to go over to Diab and work it out with him.

Next, Trowbridge recalled, Vatistas and Gonzalez "went over and spoke to Mr. Diab." Trowbridge did not participate in that discussion. Following their talk with Diab, Vatistas and Gonzalez returned to Trowbridge and told him, "Okay, it is all right. You can go ahead." Trowbridge did not recall whether they told him specifically that Diab had dropped the requirement of a confirmation from Abu Simbel; rather, "They told me that they had succeeded in their mission of resolving that issue." Trowbridge understood from what Vatistas and Gonzalez told him that Diab was no longer insisting on the confirmation from Abu Simbel and that all Diab wanted was a

communication from Naviagro instructing Abu Simbel to release the demurrage to Chemimetal.

Trowbridge then found Reilly and told him that the two additional terms were acceptable. Both testified that they did not discuss what they understood by the term calling for a "letter required by the plaintiff to release demurrage moneys in Egypt." As Trowbridge put it, "I did not go into that with him. I just said, 'Yes, okay.'" On cross-examination, Trowbridge explained that he did not go into the requirement with Reilly because "the matter had been specifically raised by our client and, to the best of my understanding although I did not hear the conversation discussed, resolved."

In his testimony, Gonzalez confirmed that shortly before the April 22 hearing, Trowbridge had told him to go speak with Diab, and clarify what letter Mefer required. Gonzalez and Vatistas then went over to Diab and the three of them discussed the matter. Gonzalez explained to Diab why he was unwilling to condition the release of the vessel on the receipt of the confirmation from Abu Simbel that the demurrage would be released without deductions. Diab replied, according to Gonzalez, "Yes, I understand that it is absolutely impossible to get it from Abu Simbel," and dropped the point.

Gonzalez's understanding of what Diab had told him was that Diab "was dropping his insistence that [Naviagro] obtain confirmation from Abu Simbel." Although he could not recall the exact words used by Diab, he insisted on cross-examination that Diab had used words to that effect. "I don't remember the exact words. He dropped it. That's all what [sic] I know," Gonzalez testified.

Following this exchange with Diab, Gonzalez and Vatistas returned to Trowbridge. On direct examination, Gonzalez said that he told Trowbridge, "Yes, he has agreed to go ahead and just receive the letter, that's all." On cross-examination, Gonzalez said that he couldn't remember his exact words to Trowbridge, but in effect he told him

that Diab was dropping the requirement for a confirmation from Abu Simbel.

Vatistas corroborated much of Gonzalez's testimony, although he, too, was unable to recall Diab's exact words. After the lawyers reached an agreement on the amount of the security, Diab, Gonzalez, and Vatistas discussed the requirement for a letter. On cross-examination, Vatistas testified that in this discussion, "the requirement that we get a confirmation" "was dropped." Asked by counsel to state "what you and Mr. Gonzalez and Mr. Diab said in this conversation as nearly as you can recall," Vatistas replied that he could not remember the "exact conversations," and repeatedly declined to attempt to reconstruct the conversation. Following this discussion with Diab, Gonzalez and Vatistas went to Trowbridge and told him "in substance" that Diab had dropped his requirement for a confirmation from Abu Simbel.

Diab flatly denied ever telling Gonzalez and Vatistas that he was dropping his demand that they supply a confirmation letter from Abu Simbel. Asked whether the conversation described by Gonzalez and Vatistas had ever taken place, Diab replied "No." Again, on cross-examination, Diab testified, "Nobody said, 'We cannot give you the letter.'" Indeed, he denied discussing business with Gonzalez or Vatistas at all on April 22, acknowledging only that he said hello in the morning and goodbye when he went to lunch. "I don't remember . . . . a business discussion regarding this settlement of the security and of the release of the vessel," he said. Rather, he claimed that all the negotiations were conducted through the lawyers.

After Trowbridge told Reilly that Gonzalez would accept the two extra conditions, the two lawyers promptly went before Judge Munson. Reilly told the judge that they had "been able to resolve the dispute" and proceeded to describe to the court the terms of their "resolution," as follows:

MR. REILLY: The resolution provides first of all, that the owners, the defendants in this action, will provide charterers with a letter required by char-

ter[ers], to obtain release of the [demurrage] monies presently held by receivers in Egypt, that is the first point.

The second point is that the owners will put in escrow the sum of $139,000 to be held in escrow to satisfy claims of either party as resolved by a net arbitration award to be issued in London.

The third point is that the charter[ers] —pardon me—the owners will provide security in the amount of $161,000 in a satisfactory form to be held to satisfy a net arbitration award to be issued in London.

The fourth point is that my client, the charter[er], will put up security in the amount of $61,000 to be held—in a satisfactory form to be held to satisfy a net arbitration award in London.

The defendants will withdraw their motion to vacate the attachment with prejudice and withdraw their motion to reduce the security with prejudice. Both parties agree to this agreement without prejudice to the rights of any party in the London arbitration. Both parties agree to give their counsel in London irreputable [sic] final authority to agree on the fastest possible arbitration proceeding there, even if such agreement entails replacing one or more of the arbitrators already appointed or appointing a sole arbitrator to hear the arbitration in London and the final point is that upon exchange of the documents that this agreement contemplates the vessel will be released from attachment.

Trowbridge testified that at that time he understood Reilly's language referring to "a letter required by charter[ers] to obtain release of the [demurrage] monies" to mean a communication from Naviagro instructing Abu Simbel to pay to Mefer's affiliate the demurrage moneys owed by the Egyptian receivers. He understood this from the report that Gonzalez and Vatistas had given him regarding their conversation with Diab.

Reilly's understanding was quite different. Diab never said to Reilly anything about dropping his requirement for a confirmation letter. Thus, when Reilly went

before the judge, he understood the "letter required by charter[ers]" to mean "not simply the telex instructions from the owners to Egypt, but a letter signed by the payor saying they would pay the money to charterer's affiliated company without deduction." However, Reilly admitted that he was aware that the owners had previously told Diab that they could not ensure that Abu Simbel would confirm that it would release the demurrage moneys without deduction.

THE EVENTS IN NEW YORK

Immediately after addressing the judge in Syracuse, Reilly told Trowbridge that he would draft a memorandum of agreement. Trowbridge and Gonzalez then went to the airport and caught an afternoon plane to New York City while Vatistas returned to the vessel in Albany in expectation of an early sailing. By coincidence, Trowbridge and Gonzalez discovered Reilly and his associate on the plane with them. On the way to pick up their luggage at LaGuardia Airport, Trowbridge and Reilly began to discuss the deal. They quickly discovered that they had different understandings of what the parties had just agreed to do.

Reilly told Trowbridge that Naviagro should send the telex to Abu Simbel right away to be sure of getting a confirmation the same week, since Thursday and Friday were holidays in Egypt. Trowbridge replied, "We are not obliged to get any confirmation. We can send a telex but we are not obliged to get a confirmation." Reilly responded, "That's not the way Mr. Diab views it," and insisted that Trowbridge "was obliged, that that's the letter that is required." Trowbridge rejected this claim, telling Reilly, "[That's] a breach of the deal. That's not required." Trowbridge did offer his client's complete cooperation in indicating to Abu Simbel that Naviagro had no claim to the demurrage from the receivers, and Reilly agreed to talk to Diab.

The following morning, April 23, Trowbridge called Reilly to ask him if he had talked to Diab yet. Reilly said he was sending over a draft memorandum of agreement, which included a term requiring Naviagro to supply a confirmation letter from Abu Simbel.

Later that day, a letter and proposed memorandum of agreement from Reilly were delivered to Trowbridge. The first paragraph of the letter stated that the draft memorandum "is intended to reflect the agreement which we announced to the court yesterday." However, the second paragraph stated that the draft "must be considered only a draft not a firm commitment." The final paragraph again urged Trowbridge to send the telex to Egypt right away in order to get a confirmation back from Abu Simbel before the Egyptian holidays. The accompanying draft memorandum of agreement included a requirement of written confirmation by Abu Simbel that the demurrage owed Mefer by its Egyptian receivers had been paid to Chemimetal without deductions.

That afternoon Trowbridge responded to Reilly's missive with a hand-delivered letter stating, "We prefer to adhere strictly to the agreement reached yesterday in Federal Court in Syracuse." Enclosed were the proposed text of an irrevocable letter of credit in the amount of $161,000 and the text of a proposed letter or telex to Abu Simbel irrevocably instructing it to release the demurrage moneys to Chemimetal.

Reilly immediately telephoned Trowbridge upon receipt of these documents and complained that the proposed letter of credit did not contain an automatic renewal clause, as he had indicated would be required while they were still in Syracuse. In response, Trowbridge testified, he promised Reilly that the letter of credit would contain an automatic renewal clause. Reilly testified that Trowbridge merely promised to use his best efforts to get the bank to include such a clause.

That evening Reilly called Trowbridge from Diab's room at the Waldorf-Astoria. First, said Reilly, Diab absolutely insisted that Naviagro supply a confirmation from Abu Simbel. Trowbridge replied, "No. We are going to stick to the deal and I am going to get you back in front of the judge." Fine, said Reilly, "I am anxious to

get back in front of the judge because your side is not performing the deal." They argued back and forth a bit and then Reilly told Trowbridge that the deal was dead.

Diab, who was advising Reilly throughout this conversation, then told Reilly, "Tell him now I want $400,000 to release the vessel." Reilly relayed this message to Trowbridge, explaining that Diab had "misunderstood the arrangement made in court and [Naviagro] would have to provide an additional $100,000 security." That is, Diab wanted Naviagro to put up a letter of credit for $261,000 rather than $161,000. Trowbridge blew up, telling Reilly, "You are breaching the deal. You shouldn't do this." He added that he would call the court the next day to arrange the earliest possible hearing and Reilly agreed to cooperate in that.

Both Reilly and Trowbridge telephoned Judge Munson's chambers the next morning, April 24, to request an early hearing. However, the earliest possible time available was the following Tuesday, April 29. As the vessel was scheduled to finish loading a perishable cargo of wheat on the afternoon of the 24th, Trowbridge tried to get the charterer to agree to allow the vessel to sail down river to New York where it would submit to rearrest and where a court hearing could be obtained sooner. Mefer refused.

The next day, Trowbridge sent another letter by hand to Reilly assuring him that any letter of credit provided by Naviagro would contain an automatic renewal clause. He went on to say that Naviagro would hold Mefer liable for the damages caused by Mefer's breach of the settlement agreement, and the consequent delay in the vessel's sailing.

On April 29, the parties returned to Judge Munson's courtroom in Syracuse. Rather than seeking specific enforcement of the deal that Naviagro claimed had been reached in court the previous week, Trowbridge asked the court to set the amount of surety bond to be posted by each side as security and counter-security in accordance with the Supplemental Rules for Certain Admiralty and Maritime Claims. However,

Trowbridge told the court that Mefer "had breached the agreement reached in Court a week ago," and that Naviagro was counterclaiming for its damages from that breach. Judge Munson ordered that Naviagro post a $300,000 bond, Mefer a $150,000 bond, and that the vessel be released upon the posting of Naviagro's bond. Naviagro did so the next morning, April 30, and the vessel was released from attachment at 1245 hours, and sailed 15 minutes later. By consent order entered in the Northern District of New York on May 8, 1980, plaintiff's claims, defendant's counterclaims, and the motion to vacate the attachment were transferred to the Southern District of New York.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

The threshold question, raised by neither party, is whether there is federal jurisdiction over this breach of contract claim. In *James Richardson & Sons v. Conners Marine Co.*, 141 F.2d 226, 228 (2d Cir. 1944), the court held that "the criterion of admiralty jurisdiction as to contracts is whether the contract is maritime, 'having reference to maritime service or maritime transactions'" (quoting *Insurance Co. v. Dunham*, 78 U.S. (11 Wall.) 1, 20 L.Ed. 90 (1871)). The contract alleged here provided for the release of a vessel from maritime attachment upon the posting of security, and the withdrawal with prejudice of the motion to vacate the attachment. It is difficult to imagine a contract more intimately "connected with maritime transportation," G. Gilmore & C. Black, The Law of Admiralty 21 (2d ed. 1975) (emphasis omitted), than one whose performance will permit a vessel to continue on its chartered voyage. Moreover, an admiralty court retains jurisdiction to enforce agreements reached in court to settle claims properly brought in admiralty. *Cf. Smith v. La Cote Basque*, 519 F.Supp. 663 (S.D.N.Y.1981), *app. dismissed without prejudice*, No. 81–7612 (2d Cir. Dec. 9, 1981) (continuing jurisdiction to enforce arbitration award). Here, the court had admiralty jurisdiction over the motion to vacate the attachment. Therefore, the court has jurisdiction under

28 U.S.C. § 1333 to hear Naviagro's breach of contract claim. The court turns next to the merits of that claim.

On April 22, the attorneys for the two parties appeared before Judge Munson and told him that they had reached an agreement. The parties agree that Reilly and Trowbridge each had full authority to bind their respective clients. Reilly, speaking for both lawyers, told the court that Naviagro would supply the "letter required by charter[ers] to obtain release of the [demurrage] monies presently held by receivers in Egypt." Trowbridge assented to Reilly's statement of the agreement. However, the testimony at trial showed that Reilly and Trowbridge had radically different understandings of what that language meant.

Trowbridge understood it to mean a letter from Naviagro instructing Abu Simbel to release the demurrage money to Mefer. Reilly understood it to require Naviagro to obtain a letter from Abu Simbel confirming that the demurrage moneys would be released without deductions. No one disputes that this term was material to the parties' manifestation of assent. Mefer argues that the lack of actual agreement, that is, a "meeting of the minds," on a material term precludes a finding of binding contract. The court disagrees.

It is well settled that if two parties give different meanings to the words of a purported agreement, the party who sues for enforcement in accordance with his own meaning has the burden of proving that the other party knew what the claimant's meaning was and that the claimant did not and had no reason to know that the other party gave the words a different meaning. *Frigaliment Importing Co. v. B.N.S. International Sales Corp.*, 190 F.Supp. 116 (S.D.N.Y.1960) (Friendly, *J.*, sitting by designation); Restatement (Second) Contracts § 20(2)(a) (Revised ed. 1981); 1 A. Corbin, Corbin on Contracts § 104 (1963 ed.). Of course, it is true that where neither party knows or has reason to know of the other's intention, no contract results. *Oswald v. Allen*, 417 F.2d 43 (2d Cir. 1969); *Raffles v. Wichelhaus*, 2 Hurl. & C. 906, 159 Eng.Rep.

375 (Ex. 1864) (two ships named "Peerless"). *See generally* 3 A. Corbin, Corbin on Contracts § 543B (1960 ed. Supp.1971); Palmer, *The Effect of Misunderstanding on Contract Formation and Reformation Under the Restatement of Contracts Second*, 65 Mich.L.Rev. 33 (1966).

Here, Naviagro had the burden to show that Mefer knew the meaning given to the words in question by Trowbridge, and that Trowbridge neither knew nor should have known of the meaning intended by Reilly. To meet this burden, Naviagro introduced evidence that Gonzalez and Vatistas met with Diab, told him that they could not supply the confirmation from Abu Simbel, and in turn, were told by Diab that he was dropping the demand for such a confirmation letter. Gonzalez and Vatistas then relayed this conversation to Trowbridge. If credited, this evidence shows that Trowbridge had no reason to think that Reilly's language referred to a confirmation letter from Abu Simbel, as he had just been told that Diab had dropped that demand.

Nor, if this evidence is credited, can Mefer hide behind Reilly's ignorance of the meaning ascribed by Trowbridge to Reilly's language. That ignorance was due solely to Diab's failure to inform his counsel, Reilly, of the concession that Diab had made to Gonzalez and Vatistas. Therefore, Diab and the corporation for which he was acting, Mefer, are estopped from denying that Reilly was privy to Diab's conversation with Gonzalez and Vatistas.

The issue thus boils down to one of credibility. If Gonzalez and Vatistas are believed, then Naviagro has met its burden in this case, and Mefer is bound by Naviagro's interpretation of the requirement for a "letter." If Diab is believed, then nothing was said to Gonzalez or Trowbridge to indicate that Mefer was dropping its demand for a confirmation letter, and given the history of negotiations between the two parties, they most surely should have known of the meaning intended by Reilly. For reasons discussed below, this court does not credit the testimony of Nemr Diab, and does cred-

it the testimony of Eduardo Gonzalez and George Vatistas.

First, Trowbridge testified in a straightforward and positive manner, and the court credits his testimony. He testified that when they were in the courthouse in Syracuse on the morning of April 22, he told Gonzalez and Vatistas to go find Diab and negotiate the requirement for a "letter" directly with him, and that they returned and indicated that Diab had dropped his demand for a confirmation from Abu Simbel. The court can imagine no reason why Gonzalez and Vatistas would mislead Trowbridge, their attorney, on this occasion. Moreover, the court finds Diab's testimony that he never discussed the terms for releasing the Kostas Melas with Gonzalez or Vatistas to be incredible in light of their common purpose in coming to the courthouse in Syracuse and their past history of negotiations. Therefore, the court finds that Gonzalez and Vatistas did in fact go and speak with Diab about Diab's demand for a confirmation from Abu Simbel that the demurrage moneys would be forwarded without deduction.

Second, the court credits Gonzalez's testimony that he told Diab in that meeting that Naviagro could not supply the confirmation from Abu Simbel that Diab wanted. It is highly unlikely that Gonzalez would speak with Diab about the demurrage moneys and not reiterate Naviagro's position.

Third, since the court has found that Diab did not testify truthfully when he denied speaking to Gonzalez and Vatistas in the courthouse on April 22 about the terms for releasing the ship, it does not credit Diab's testimony that he did not tell them that he would yield his demand for such a confirmation. Supporting the court's decision not to credit Diab's testimony is the witness's demeanor at trial.

On the contrary, the court credits the testimony of Gonzalez and Vatistas that Diab told them in substance that he would not insist on a confirmation letter. Although neither could recall Diab's exact words, both insisted on cross-examination that Diab said in effect that the confirma-

tion requirement was "dropped." Indeed, their inability to recall the exact words used by Diab is not surprising considering that they were testifying some 19 months after the events in question, and that each one was testifying in English, which was not their native language. Finally, the court notes that Vatistas, whatever his connection with Naviagro in April of 1980, is presently self-employed and was not shown to have any personal interest in the outcome of this case.

■ There is no merit to Mefer's argument that the terms of the April 22 agreement were too indefinite to permit enforcement of the contract. Specifically, Mefer points to the requirements for the "letter required by charterers" and for "satisfactory" security. First, suggests Mefer, a "letter" is not a telex. The court finds that the parties understood "letter" to mean any written or telegraphic communication. Second, although the "letter required by charterers" is ambiguous, the court has found that Mefer is bound by Naviagro's interpretation of that term. Last, the requirement for "satisfactory" security is enforceable in accordance with the prior dealings of the parties and trade usage. Here, the evidence indicates that both lawyers understood this to mean a letter of credit with an automatic renewal clause.

■ Nor is there any merit to Mefer's claim that the parties intended not to be bound until their agreement had been reduced to writing. Nothing was said in open court to indicate any intent not to be bound until a written agreement had been executed. On the contrary, Reilly told Trowbridge at LaGuardia Airport on April 22 that Naviagro "was obliged" to provide a confirmation letter from Abu Simbel and that it should without delay send the telex instructing Abu Simbel to forward the demurrage moneys to Mefer's affiliate. Reilly's demand for performance indicates that he thought the agreement was binding.

Mefer argues that Reilly always intended to draw up a "written memorandum of agreement that the parties could sign." Al-

though the court credits Reilly's testimony to that effect, "the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event." *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir. 1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969). In short, the court finds that the parties intended to be bound by the agreement announced in court following the April 22 hearing and that all that remained was the sending of a telex to Abu Simbel and the execution of the documents called for in that agreement.

■ The next question is whether Mefer breached the agreement. Naviagro tendered to Mefer the text of a telex to be sent to Abu Simbel and a proposed form of a letter of credit. Mefer does not dispute that the telex would have been sufficient to satisfy Naviagro's obligation to instruct Abu Simbel to pay the demurrage moneys to Chemimetal. Mefer does argue that the proposed letter of credit did not fulfill Naviagro's obligation to provide "satisfactory" security because it did not contain an automatic renewal clause.

Trowbridge testified that after Reilly objected to the proposed letter of credit, he assured Reilly that Naviagro would supply a letter of credit with an automatic renewal clause. The only reason he did not do so, said Trowbridge, was that by then Reilly and Diab were insisting on a confirmation letter from Abu Simbel, which insistence Trowbridge viewed as a repudiation of the deal. Reilly testified that Trowbridge merely offered to use his best efforts to get an automatic renewal clause. The court finds that in the circumstances of this case, Trowbridge's promise to use his best efforts was tantamount to an assurance that such a clause would be included. In any case, Trowbridge explicitly promised to include an automatic renewal clause in his letter to Reilly dated April 25. Reilly rejected this tender as well. The court concludes that Trowbridge made a good tender of performance to Reilly, whose rejection of that offer to perform constituted a breach of the settlement agreement.

■ The final question that remains is that of damages. Naviagro is entitled to recover the foreseeable losses and expenses incurred by it as the consequence of Mefer's breach. Naviagro claims that if Mefer had honored the settlement agreement, the Kostas Melas would have sailed when it finished loading at 1:00 p. m. on April 24, 1980. However, Vatistas testified that he did not know whether the tide at Albany would have permitted the vessel to sail then. Although Naviagro did not show when the vessel could have left on April 24, the court can and does take judicial notice of the fact that high tides occur twice every day. Therefore, the longest the Kostas Melas would have had to wait for a high tide would have been 12 hours. The court finds, then, that the Kostas Melas would have sailed by 2:00 a. m. on April 25 had the agreement been performed. Mefer's breach forced Naviagro to return to court on April 29 to have bond set for the vessel's release, with the result that the vessel could not sail until 1300 hours on April 30, a delay of five days and 11 hours.

Naviagro introduced evidence that the Kostas Melas lost charter hire at the rate of $8,100 per day as the result of the breach. For five days and 11 hours that amounts to a loss of $44,212.49. The dockage fees were $509.11 per day, for a total of $2,778.89. Vatistas testified that each day in port the Kostas Melas burned one ton of fuel oil at $199.50 per ton, and 1½ tons of diesel fuel at $375 per ton. Therefore, Naviagro's expenses for fuel and diesel oil amounted to $1,088.93 and $3,070.30 respectively.

Naviagro's expenses for pilots ($287.50), tugs ($713.88), linesmen ($702.96), and the premium for a $300,000 surety bond rather than a $161,000 letter of credit ($1,750), were all incurred after April 25 and are proper items of damages.

Finally, Naviagro is entitled to compensation for the cost of obtaining the release of Kostas Melas in the April 29 hearing, as those expenses were a "natural and probable consequence" of Mefer's breach of the settlement agreement. *Howells v. Albert,*

37 Misc.2d 856, 859, 236 N.Y.S.2d 654 (1962). The expenses shown at trial included attorney's fees ($3,687.50) and round trip transportation between New York and Syracuse ($118).

In sum, the court finds that Naviagro suffered damages totaling $58,410.45.

The foregoing constitutes the court's findings of fact and conclusions of law pursuant to Rule 52, Fed.R.Civ.P.

The court directs the clerk of the court to enter judgment for Naviagro against the plaintiff, Mefer, for $58,410.45.