OPINION OF THE COURT
Hilda G. Schwartz, J.
This action was brought by the plaintiff general contractor in the construction trade, against the defendant concrete and cement work subcontractor, for failure to comply with its oral bid, on which plaintiff relied in preparing and submitting its general contractor’s bid. Defendant thereafter refused to perform in accordance with such oral bid.
It was established at the trial that in August, 1972, R. H. Macy & Co., Inc. ("Macy’s”), announced its intention to erect a *1064 department store building at the Sunrise Mall shopping center in Massapequa, Long Island (Sunrise Mall project), and distributed to the building trade its invitation to bid on the project, with a requirement that all general contractors’ bids be received by Macy’s not later than August 31, 1972.
The fact that Macy’s was inviting bids to erect the Sunrise Mall project was circulated to the construction trade in the New York metropolitan area in the trade press, particularly including a newsletter called the Dodge Reports.
After learning of the Sunrise Mall project from reading of it in the Dodge Reports, the defendant obtained the plans and specifications for that project (which had been prepared by Macy’s architect) and studied them over a period of a week, preparing a detailed analysis of the concrete work called for by Macy’s plans and specifications.
Most subcontractors’ bids were received orally, often on the very day the general contractors’ bid was due, and were recorded on plaintiffs form designed for that purpose.
On August 29, 1972, the defendant submitted by telephone a bid to the plaintiff to perform the concrete work on the Sunrise Mall project (called for by section 3B of Macy’s specifications) for a total price of $275,000, excluding mechanical pads and sidewalks. Defendant’s $275,000 bid was the lowest received by plaintiff for the concrete work.
Plaintiffs vice-president in charge of the project accordingly directed the project manager to call the defendant on August 31, 1972, to confirm the $275,000 bid. The project manager did so, and defendant’s president, Mr. Sal Spilabotte, indicated that he understood the nature and scope of the work called for, and assured plaintiff that defendant’s bid to perform that work was $275,000.
Both defendant’s original bid of August 29 and the confirmation of that bid on August 31 were recorded, as received, by plaintiffs employees who had the discussion with the defendant’s officers or employees.
Defendant submitted the same bid to perform the concrete work on the Sunrise Mall project for $275,000 to all general contractors (i.e., plaintiff and plaintiffs competitors) who were indicated by the Dodge Reports to be interested in bidding on the Sunrise Mall project. After receiving confirmation of defendant’s bid on August 31, 1972, plaintiff used that $275,- *1065 000 bid for the concrete work in preparing its general contractor’s bid to Macy’s.
Plaintiff relied on defendant’s bid to perform the concrete subcontract in preparing its general contractor’s bid to Macy’s. On August 31, 1972, plaintiff submitted its general contractor’s bid to Macy’s to perform the Sunrise Mall project for a total construction cost of $3,917,000. Plaintiff’s bid to Macy’s included exactly $275,000 for the concrete work (excluding mechanical pads and sidewalks). On or about September 18, 1972, plaintiff was advised, orally and by letter of intent from Macy’s, that it had been awarded the general contract to perform the Sunrise Mall project for a "lump-sum” price of $3,917,000.
Promptly after plaintiff was notified that it had been awarded the general contract for the Sunrise Mall project, plaintiff contacted defendant and advised defendant that its bid was successful and that it was awarded the subcontract to perform the concrete work. Plaintiff invited defendant’s management to come in plaintiff’s office to meet plaintiff’s supervisors and to become familiar with plaintiff’s working procedures. Plaintiff expected that the subcontract with defendant would eventually be reduced to a written subcontract on the printed form furnished by the American Institute of Architects, a form which plaintiff routinely used with all subcontractors of all its jobs.
Defendant refused to come to plaintiff’s offices and refused to perform in accordance with its bid.
The next lowest bid received by plaintiff on or before August 31, 1972 (the day its general contractor’s bid was due to Macy’s) was that of Peter Scalamandri & Sons, Inc. ("Scalamandri”), of Freeport, New York, which had submitted a bid of $340,000 to perform the concrete work including mechanical pads and sidewalks.
Upon defendant’s refusal to perform in accordance with its bid, plaintiff contacted Scalamandri to ascertain whether Scalamandri would undertake such concrete work at its bid price of $340,000 and received an affirmative answer. In Scalamandri’s bid, mechanical pads and sidewalks were separately stated as an item for a total price of $21,000.
The net difference between defendant’s bid and Scalamandri’s bid to perform the concrete work called for by Macy’s plans and specifications (excluding mechanical pads and sidewalks) was $44,000.
*1066 Defendant does not dispute that it placed an oral bid with plaintiff of $275,000 for the concrete work. Defendant claims that after plaintiff was awarded the contract by Macy’s, plaintiff called defendant into their offices to sign a contract and defendant admits, it failed and refused to sign an agreement.
Defendant contends that the bid admittedly made by the defendant was merely the beginning of negotiations and that defendant could not reasonably anticipate that plaintiff would deem such bid as a firm bid embracing all the elements of a complicated construction job.
Defendant argues that plaintiff should have, in advance, secured a written contract conditioned upon the success of its bid to the owner. It contends that there was no acceptance by the plaintiff of defendant’s bid and therefore no contract; that plaintiff’s use of the defendant’s figure for concrete in plaintiff’s bid to the owner, was not the equivalent of an acceptance. Defendant cites Baird & Co. v Gimbel Bros. (64 F2d 344). This case was decided 44 years ago, predating the theory of promissory estoppel in bidding. In a recent Federal Court of Appeals decision, the Baird rational was rejected. (Debron Corp. v National Homes Constr. Corp., 493 F2d 352.) In Debron, the defendant bid on the steel erection subcontract and the plaintiff general contractor used that bid as part of its total bid to the New York State University Construction Fund. Thereafter, defendant withdrew its bid. The court rejected the defendant’s arguments that vital matters had been left open by the bid, and directed judgment in favor of the plaintiff, finding that the overwhelming weight of recent authority favored application of the promissory estoppel doctrine to construction bid cases (p 357). Defendant claims that plaintiff did not protect itself and that in commercial transactions it does not in the end promote justice to seek strained interpretations in aid of those who do not protect themselves (Baird, supra, p 346).
The doctrine of promissory estoppel is intended to avoid the harsh results of allowing the promisor to repudiate, when the promisee has acted in reliance upon the promise.
The elements of a promissory estoppel are a promise clear and unambiguous in its terms; reliance by the party to whom the promise is made, such reliance to be both reasonable and foreseeable; the party asserting the estoppel must be injured by his reliance.
*1067 The Appellate Division, Fourth Department, in 1975, held that prices for valves given by a manufacturer with knowledge they would be used in bids submitted in bids for the plumbing subcontracts in construction of a sewage treatment plant, constituted offers. When the plumbing subcontractor, who used the quotation in his bid, was awarded the subcontract and thereafter, the valve manufacturer discontinued the valves, the plumbing subcontractor is entitled to recover its loss when obliged to purchase elsewhere. (Rochester Plumbing Supply Co. v A. Burgart, Inc., 49 AD2d 78; see, also, Rouse Constr. Corp. v Albany Acoustical Corp., 9 AD2d 38.) In the publication of the American Bar Association’s National Institute on Construction Claims (1977) it is stated: "As a general rule, when a subcontractor refuses to perform at his submitted quotation, courts have usually held the subcontractors to his bid absent unusual considerations, or allowed the prime contractor to recover damages if he is forced to use another subcontractor at a higher price. The rational for such decisions is the doctrine of promissory estoppel, which is well defined in the Restatement (Second) of Contracts, Sec. 90”. In Balaban-Gordon Co. v Brighton Sewer Dish No. 2 (41 AD2d 246, 247) the court stated: "A bid is a binding offer to make a contract.”
The court finds that defendant made a clear and unambiguous bid on which plaintiff relied, to its damage and that such reliance was reasonable and foreseeable. The defendant, under the doctrine of promissory estoppel, is therefore liable for such damage.
After trial, the plaintiff is awarded the sum of $44,000 in damages against the defendant.