Vincent B. MURPHY, Jr., Plaintiff,

v.

John H. GUTFREUND, Richard J. Schmeelk, Gedale Horowitz, Richard G. Rosenthal, J. Ira Harris, Thomas W. Strauss and William J. Voute, Liquidators of Salomon Brothers Holding Company and Salomon Brothers, Defendants.

No. 82 Civ. 2394 (MEL).

United States District Court,
S.D. New York.

April 3, 1984.

Patterson, Belknap, Webb & Tyler, New York City, for plaintiff; Frederick T. Davis, Leslie C. Levin, Lynn P. Freedman, New York City, of counsel.

Wachtell, Lipton, Rosen & Katz, New York City, for defendants; Herbert M. Wachtell, Theodore N. Mirvis, Barry A. Weprin, Louis J. Barash, New York City, of counsel.

LASKER, District Judge.

This suit arises out of the buyout of Salomon Brothers in 1981 by Phibro Corp. Plaintiff Vincent B. Murphy, until 1980 a former Salomon Brothers general partner, has brought this action for the alleged breach of an annuity agreement by defendants under which plaintiff was to receive $125,000 per year for ten years. Defendants, Liquidators of Salomon Brothers Holding Company ("SBHC") and of Salomon Brothers, move to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1] For the reasons set forth below, defendants' motion is granted in part and denied in part.

## I.

The relevant facts alleged in the complaint are that from 1967 to 1980 Murphy was a general partner of Salomon Brothers. In late 1979, he began to consider leaving Salomon and in early 1980 spoke about the possibility to defendant John Gutfreund, at that time managing partner of Salomon and head of its Executive Committee. Later in 1980, Murphy initiated discussions with Merrill Lynch & Co. about his becoming a Senior Advisor to that organization's residential real estate and mortgage insurance businesses. Murphy told Gutfreund about these discussions to see whether Salomon Brothers would object to his association with Merrill Lynch. Murphy had to receive the approval of the Salomon Brothers' Executive Committee before he could accept the Merrill Lynch position. Under the terms of the non-competition provision in the Salomon Brothers partnership agreement, former general partners of Salomon Brothers were barred from competing against Salomon Brothers Holding Company or its subsidiaries by engaging in "a securities, financial or kindred business" for two years after they terminated their status as general partners un-

---

1. Although the parties have submitted affidavits in support and in opposition to the motion, only the pleadings are relied upon in order to resolve the questions presented here. However, documents attached as exhibits to the affidavits are utilized where they are not subject to dispute. *See generally Mayer v. Oil Field Systems Corp.,* 721 F.2d 59, 62–63 (2d Cir.1983).

less they received approval from the Executive Committee. Gutfreund subsequently informed Murphy that the Executive Committee would raise no objections to his association with Merrill Lynch because the Committee believed that he would not be competing with Salomon.

In reliance upon this representation, in October 1980 Murphy resigned as a general partner to become a Senior Advisor to Merrill Lynch's residential real estate and mortgage insurance businesses. Murphy held that position until February 1982 when he became president of Merrill Lynch Capital Resources, Inc. In September, 1980, the Executive Committee had voted to make Murphy a limited partner effective at the time of his resignation as a general partner in recognition of Murphy's contribution to Salomon Brothers.[2]

In early August of 1981, Phibro agreed to purchase the assets of Salomon Brothers for approximately $550 million. Pursuant to the Plan of Dissolution adopted by the Salomon Brothers Executive Committee at that time, all former general Salomon partners who had become limited partners were to receive an annuity of $125,000 per year for ten years provided that they signed an agreement prohibiting them from competing with Salomon Brothers, Inc., the new Phibro entity, and releasing Salomon Brothers, SBHC, and its partners from any and all claims arising out of or relating to the dissolution.

On August 11, 1981, Murphy discussed with Gutfreund whether, in light of his work for Merrill Lynch, the non-competition provision in the annuity agreement would apply to him. While Gutfreund stated that he thought that Murphy would be eligible to receive the annuity benefits, he referred Gutfreund to Allan Sperling, Salomon Brothers' attorney.[3] Sperling adopted a different position. He stated that Murphy's position with Merrill Lynch might put him in competition with Salomon Brothers,

SBHC, or Salomon Brothers, Inc.[4] Sperling subsequently drafted a letter on August 19, 1981 stating that all former general partners who were then limited partners and who wished to accept the proposed annuity would have to execute the annuity agreement.

On October 1, 1981 Salomon Brothers and SBHC were dissolved and were succeeded by the SBHC Liquidating Partnership. The members of the Salomon Brothers Executive Committee became the liquidators of SBHC on that date and they are the defendants in this suit. On October 6, 1981, Murphy received two unsigned copies of the annuity agreement which provided for payment of the first installment of the annual annuity on or about January 4, 1982. Murphy signed both copies and returned them to the SBHC Liquidating Partnership's attorneys. On December 30, 1981, Sperling contacted Murphy to determine whether he still held his position with Merrill Lynch. When Murphy answered that he did, Sperling stated that it was his clients' position that Murphy's work for Merrill Lynch violated the non-competition clause in the annuity agreement. Murphy said he believed his activities for the real estate and mortgage insurance businesses of Merrill Lynch & Co. were not competitive with any business of Salomon Brothers, Inc. Notwithstanding this disagreement between the parties, on December 31, 1981 a copy of the annuity agreement bearing the signature of Donald M. Feurstein, representing Salomon Brothers and SBHC, was delivered to Murphy's office.

The first payment under the annuity agreement was due on January 4, 1981. When Murphy did not receive the remittance his attorneys wrote Gutfreund demanding payment under the terms of the annuity agreement. By letter of January 20, 1982, from the liquidating partnership, Murphy was informed that he was not entitled to payments under the agreement because since October 1, 1981 he had been

---

**2.** *See* Complaint ¶ 18, *reprinted in,* Affidavit of Donald M. Feuerstein, filed Aug. 13, 1982, at Exhibit A [hereinafter "Complaint"].

**3.** *See id.* ¶¶ 24–25.

**4.** *See id.* ¶ 24.

employed by a competitor of Salomon Brothers, Inc.

Murphy commenced this action on April 15, 1982 to enforce the agreement in his favor. His complaint alleges that: defendants have breached the annuity agreement (count 1); the non-competition provision in the annuity agreement is impermissibly overbroad, constitutes an unreasonable restraint of trade and is contrary to public policy (count 2); defendants' repudiation and non-performance of the annuity agreement is a breach of the agreement which entitles him to the total amount due under the agreement (count 3); Murphy detrimentally relied upon defendants' assurances that his activities for Merrill Lynch were not in competition with the business of Salomon Brothers or of Salomon Brothers, Inc. (count 4); defendants are estopped from claiming that Murphy's activities violate the annuity agreement because they signed the agreement fully aware of his employment and intent (count 5); defendants have breached a fiduciary duty which they owed to Murphy (count 6); and that defendants have violated Section 10(b) of the Securities Exchange Act of 1934, and SEC Rule 10b–5 (count 7). Defendants move to dismiss the complaint on the ground that it fails to state a claim upon which relief can be granted.

## II.

Count 1—Breach of the Annuity Agreement

Defendants make several arguments in support of a dismissal of the first count of the complaint which alleges that they have breached the annuity agreement. The one argument which we consider dispositive is their assertion that plaintiff was aware of defendants' interpretation of the non-competition provision in the annuity agreement before he entered into the agreement with them. They point out that Allan Sperling advised Murphy on August 11, 1981 that his position with Merrill Lynch would fall within the annuity agreement's non-competition provision and that in executing the agreement in October 1981 Murphy fully understood that his continued employment for Merrill Lynch would render him ineligible to receive payments.

Murphy argues that the annuity agreement should be enforced against the defendants because they were fully aware at the time they entered into the agreement that he considered the scope of the non-competition clause to be so limited as not to apply to his activities as an employee of Merrill Lynch. Because they chose to sign the agreement on those terms, Murphy asserts that they are bound by that understanding.

Whether Murphy's allegation of a breach of the agreement is sufficient turns upon which party is entitled to a favorable interpretation of the non-competition provision. We are guided by Judge Lumbard's view that:

"It is well settled that if two parties give different meanings to the words of a purported agreement, the party who sues for enforcement in accordance with his own meaning has the burden of proving that the other party knew what the claimant's meaning was and that the claimant did not and had no reason to know that the other party gave the words a different meaning."[5]

In this case, Murphy seeks to enforce the terms of the annuity agreement in his favor, based upon his understanding that his work for Merrill Lynch's real estate and insurance businesses did not preclude his receipt of the annual annuity. As the facts discussed above indicate, however, defendants, through their attorney Allan Sperling, had stated to Murphy, despite Murphy's protests to the contrary, that his employment might come within the terms of the non-competition provision. Accordingly, since the complaint itself as-

**5.** *Mefer S.A.R.L. v. Naviagro Maritime Corp.*, 533 F.Supp. 337, 345 (S.D.N.Y.1982) (Lumbard, J., sitting by designation), *citing, Frigaliment Importing Co. v. B.N.S. Int'l Sales Corp.*, 190 F.Supp. 116 (S.D.N.Y.1960) (Friendly, J., sitting by designation); RESTATEMENT (SECOND) OF CONTRACTS § 20(2)(a) (1981); 1A A. CORBIN, CORBIN ON CONTRACTS § 104 (1963).

serts, at paragraph 25, that plaintiff's activities at Merrill Lynch might constitute competition with Salomon, the annuity agreement must be construed in fairness in favor of the defendants.[6] Accordingly, defendants' motion to dismiss the first count of the complaint is granted.

## III.

Count 2—The Unreasonableness of the Annuity Agreement

The second count of the complaint alleges that the annuity agreement is impermissibly overbroad, constitutes an unreasonable restraint of trade, and is contrary to public policy. Defendants move to dismiss on two grounds. They argue that an inquiry into the reasonableness of the annuity agreement's non-competition provision is not warranted in this instance because the provision does not restrain trade but only affords Murphy the "choice" of accepting the annuity or working for a competitor. As a result, they assert that this case falls within the "employee choice" doctrine which holds that "[u]nder New York case law, a contract which affords an ex-employee a choice between working for a competitor (and thereby foregoing divested benefits) or retaining those benefits by not working for a competitor is not an unreasonable restraint of trade."[7]

Defendants note that the Second Circuit in *Bradford v. New York Times Co.*,[8] decided in 1974, declined to hold that New York had adopted the "employee choice" doctrine because it had not been discussed in any New York Court of Appeals case subsequent to that court's affirmation without opinion of a 1958 Appellate Division case.[9] Defendants argue, however, that the New York Court of Appeals has reaffirmed the vitality of the doctrine in *Post v. Merrill Lynch, Pierce, Fenner & Smith*,[10] discussed below.

Defendants' second ground for dismissal is that the payments to be made under the annuity agreement to Murphy were a gift. Accordingly the terms of the annuity cannot be held to be unreasonable because the general partners of Salomon Brothers had no obligation to make any payments at all to Murphy.

Murphy contends that he is entitled to challenge the reasonableness of the non-competition provision because the Second Circuit's ruling in *Bradford* continues to apply. Murphy asserts that proof at a trial would show that he was encouraged by Gutfreund to leave Salomon Brothers, that he received explicit assurances from the Salomon Brothers' Executive Committee that his position with Merrill Lynch was not in competition with Salomon Brothers, and that he would not be prejudiced by

---

**6.** In their Reply Memorandum, defendants allude to the fact that given the diametrically opposite views of the parties when they entered into the agreement, there might have been no "meeting of the minds" and therefore no contract at all. *See, e.g., Raffles v. Wichelhaus,* 159 Eng.Rep. 375 (Ex.1864). This is not such a case because both parties were aware of the other's position about the scope of the noncompetition provision before and at the time they entered into the agreement. The "meeting of the minds" doctrine applies only when both parties hold different understandings of an agreement, do not disclose their respective positions to each other, nor have any reason to know of any difference in interpretation between them. *See Oswald v. Allen,* 417 F.2d 43, 45 (2d Cir.1969); *Mejer S.A. R.L. v. Naviagro Maritime Corp.,* 533 F.Supp. 337, 345 (S.D.N.Y.1982).

**7.** *Bradford v. New York Times Co.,* 67 Civ. 3821 [MEL], slip op. at 26, (S.D.N.Y. filed July 17, 1973), *aff'd on other grounds,* 501 F.2d 51 (2d

Cir.1974); *see also Diakoff v. American Re-Insurance Co.,* 492 F.Supp. 1115 (S.D.N.Y.1980) (Sand, J.); *Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 48 N.Y.2d 84, 397 N.E.2d 358, 421 N.Y.S.2d 847 (1979); *Kristt v. Whelan,* 4 A.D.2d 195, 164 N.Y.S.2d 239 (1957), *aff'd mem.,* 5 N.Y.2d 807, 155 N.E.2d 116, 181 N.Y.S.2d 205 (1958).

**8.** 501 F.2d 51 (2d Cir.1974).

**9.** *Id.,* 501 F.2d at 55–56, *discussing, Kristt v. Whelan,* 4 A.D.2d 195, 164 N.Y.S.2d 239 (1957), *aff'd mem.,* 5 N.Y.2d 807, 155 N.E.2d 116, 181 N.Y.S.2d 205 (1958).

**10.** 48 N.Y.2d 84, 397 N.E.2d 358, 421 N.Y.S.2d 847 (1979). Defendants also cite *Diakoff v. Am. Re-Insurance Co.,* 492 F.Supp. 1115 (S.D.N.Y. 1980), presumably to show that the "employee choice" doctrine has been adopted by this court as well.

taking the position. As a result, Murphy claims that the annuity agreement's non-competition provision created a "Hobson's choice" for him. He could either accept the payments and quit Merrill Lynch or work for Merrill Lynch and forego the annuity. Murphy argues that a true "employee choice" would have existed for him had defendants made known their position about his work for Merrill Lynch at the time he was considering leaving Salomon Brothers.

Murphy further argues that the payments were not a gift because the annuity agreement explicitly provided that he released SBHC, Salomon Brothers and its partners from "any and all claims which [Murphy, in his capacity as a] Former General Partner at any time had, has, or may have ... arising out of or in any way relating to the dissolution, liquidation or termination of SBHC or Salomon Brothers." [11] It follows, according to Murphy, that the annuity payments were the consideration for the release and support the finding of a valid contract. Finally, Murphy asserts that the reasonableness of the annuity agreement's non-competition provision is an issue of fact and that defendants' motion should be denied.

■ We agree with Murphy that his release of defendants and other members of Salomon Brothers from exposure to liability constitutes adequate consideration to reject defendants' contention that the annuity payments are a "gift." However, determining whether the "employee choice" doctrine applies in this instance requires a more detailed analysis.

In *Bradford v. New York Times Co.*, Bradford challenged the reasonableness of the non-competition provision embodied in the New York Times Company's Incentive Compensation Plan which it provides for its executives. The Court of Appeals of this Circuit found that the New York courts had not adopted the doctrine because *Kristt v. Whelan,*[12] a 1958 summary affirmance of an "employee choice" case, by the New York Court of Appeals had not been followed or applied in any of its subsequent decisions.[13]

Since *Bradford,* the New York Court of Appeals has again considered the *Kristt* rule in *Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*[14] in which it held that the "employee choice" doctrine does not apply in instances when an employee has been discharged involuntarily and then goes to work for a competitor. Post and Maney were account executives at Merrill Lynch for many years. Following the involuntary termination of their employment in 1974, they began working for a Merrill Lynch competitor. Merrill Lynch subsequently informed Post and Maney that they had forfeited all of their rights in the company-funded pension plan because the plan permitted forfeiture in the event an employee competed directly or indirectly against Merrill Lynch.[15]

In an action to recover the funds owed to them under the pension plan, the Appellate Division dismissed Post's and Maney's complaint on the ground that the "employee choice" doctrine applied.[16] The Court of Appeals reversed, however, on the ground that an employee choice was not involved. The court explained: "the State enforces limited restraints on an employee's employment mobility where a mutuality of obligation is freely bargained for by the parties. An essential aspect of that relationship, however, is the employer's continued willingness to employ the party covenanting

---

**11.** Annuity Agreement, at 4–5, *reprinted in,* Complaint, *supra* note 2, at Exhibit C, April 15, 1982 (hereinafter "Annuity Agreement").

**12.** 4 A.D.2d 195, 164 N.Y.S.2d 239 (1957), *aff'd mem.,* 5 N.Y.2d 807, 155 N.E.2d 116, 181 N.Y.S.2d 205 (1958).

**13.** *See Bradford v. New York Times Co.,* 501 F.2d at 55–56.

**14.** 48 N.Y.2d 84, 397 N.E.2d 358, 421 N.Y.S.2d 847 (1979).

**15.** *Id.,* 48 N.Y.2d at 87, 397 N.E.2d at 359, 421 N.Y.S.2d at 848.

**16.** *Id.*

not to compete."[17] In a case where the employer discharges an employee without cause, "his action necessarily destroys the mutuality of obligation on which the covenant rests."[18] Moreover, the court went further to hold

"that where an employee is involuntarily discharged by his employer without cause and thereafter enters into competition with his former employer, and where the employer, based upon such competition, would forfeit the pension benefits earned by his former employee, such a forfeiture is unreasonable as a matter of law and cannot stand."[19]

In *Diakoff v. American Re-Insurance Co.*,[20] Judge Sand explored the scope of the "employee choice" doctrine in the aftermath of the *Bradford* and *Post* rulings. Like Bradford, Diakoff, who had voluntarily resigned his position and had begun working for a competitor, challenged the reasonableness of the non-competition clause in his former employer's executive Incentive Compensation Plan. Under those circumstances, and in light of the New York Court of Appeals' discussion of the applicability of the "employee choice" doctrine in *Post,* Judge Sand concluded that the doctrine remains in effect when the employee is afforded a genuine choice of options and that the doctrine is not applicable when an employee is discharged involuntarily and without cause.[21] In his words:

"The clear implication of the Court [of Appeals'] decision in *Post* is that *Kristt* continues to set forth the rule applicable to incentive compensation plans except for cases of involuntary termination. We read *Post* therefore as a statement that in cases such as the case before this Court, where the employee has the choice of preserving his benefits or forfeiting

them by resigning to work for a competitor, *Kristt* continues in force."[22]

■ We interpret the preceding cases as standing for the proposition that the "employee choice" doctrine continues to preclude inquiries into the reasonableness of non-competition provisions in incentive compensation or pension plans when the employee is presented with a genuine knowing and voluntary choice either of working for a competitor and foregoing benefits or of accepting the benefits and not working for a competitor. However, when the employee is presented with no such choice, the doctrine does not apply.[23]

Determining whether the "employee choice" doctrine applies in this case therefore hinges upon an evaluation of the kind of choices presented to Murphy, first, at the time he left Salomon Brothers to work for Merrill Lynch and later, at the time he agreed to abide by the terms of the annuity agreement. In this regard, we are persuaded by Murphy's arguments that the kind of choice which he confronted at the time he entered into the annuity agreement is not of the type that has led to application of the "employee choice" doctrine.

■ At the time he left Salomon Brothers, defendants represented to Murphy that he would not be subject to the non-compete aspects of the Salomon Brothers partnership agreement. It was only after Murphy joined Merrill Lynch that he was apprised of the terms of the annuity agreement's non-competition provision. As a result, the choice that Murphy faced as a person who had already become a Merrill Lynch employee, either to quit his position or accept the annuity, was materially different from the situation in which the "employee choice" doctrine has been invoked. In those cases, the employee has been

**17.** *Id.,* 48 N.Y.2d at 90; 397 N.E.2d at 360; 421 N.Y.S.2d at 849.

**18.** *Id.*

**19.** *Id.*

**20.** 492 F.Supp. 1115 (S.D.N.Y.1980).

**21.** *See id.* at 1121–23.

**22.** *Id.* at 1123.

**23.** We accordingly disagree with defendants that the "employee choice" doctrine ordinarily applies, except in cases where an employee's position is involuntarily terminated without cause.

presented with the choice of accepting benefits or working for a competitor *before* the employee changes position in a manner which affects either option. However, Murphy's "choice" arose only *after* his position had changed. Indeed, it is alleged that defendants represented to Murphy that he would not be giving up anything by making this career change. As a result, Murphy was not in the same kind of neutral position to weigh his options that has led courts to find genuine employee choice and to invoke the "employee choice" doctrine.

The "employee choice" doctrine can only be fairly applied when the employee may choose between accepting benefits and working for a competitor at a time before the employee has made a commitment to either option. It follows that it does not apply, here, where the employee had been told by the former employer that his new position was not in competition with that employer who later offers the employee the choice of quitting the new position or accepting a proffered annuity.

Murphy is therefore entitled to challenge the reasonableness of the non-competition provision, a challenge which raises triable issues of fact. Defendants' motion to dismiss the second count of the complaint is accordingly denied.

### IV.

Count 3—Total Breach

The third count of the complaint alleges that defendants' repudiation and non-performance of the annuity agreement constitute a total breach of the agreement and that Murphy is entitled to the total amount due under the agreement. Defendants move to dismiss on the ground that since there was no "breach" by them, there could be no "total breach."

Murphy argues that he is entitled to damages for total breach of the annuity agreement because defendants breached the contract when they failed to make the first payment on January 4, 1982 and they subsequently repudiated the agreement when defendant Feuerstein wrote to Murphy on January 20, 1982 to state that payment would not be made. Murphy asserts that at trial he will demonstrate that defendants' breach was intentional and in bad faith, thus satisfying the definition of "total breach".

For the reasons discussed above, it has been determined that Murphy cannot allege a partial breach of the annuity agreement.[24] It follows that the allegation of total breach must be legally insufficient. Defendants' motion to dismiss the third count of the complaint is accordingly granted.

### V.

Count 4—Promissory Estoppel

As a fourth cause of action, Murphy asserts that he has relied to his detriment on the assurances of the defendants that his activities at Merrill Lynch were not in competition with Salomon Brothers. He contends that as a result, defendants are estopped from claiming that he is competing with Salomon Brothers, Inc. and that they are therefore liable to him for the full amount of the annuity agreement.

Defendants move to dismiss this claim on the ground that New York law does not recognize a promissory estoppel claim under such circumstances. They rely upon a ruling by the Appellate Division, Second Department in *Swerdloff v. Mobil Oil Corp.*[25] that promissory estoppel has not existed in New York law, aside from a number of narrow exceptions which are not applicable here. Defendants assert that *Swerdloff* has been reaffirmed by the Appellate Division, First Department[26] and

---

24. *See supra* text at page 961.

25. 74 A.D.2d 258, 427 N.Y.S.2d 266, *appeal denied,* 50 N.Y.2d 913, 409 N.E.2d 995, 431 N.Y. S.2d 523 (1980).

26. *See Tribune Printing Co. v. 263 Ninth Ave. Realty, Inc.,* 88 A.D.2d 877, 879, 452 N.Y.S.2d 590, 593, *aff'd,* 57 N.Y.2d 1038, 444 N.E.2d 35, 457 N.Y.S.2d 785 (1982).

that the Second Circuit Court of Appeals applies the doctrine of promissory estoppel to a limited class of cases, not inclusive of this one. Murphy responds that New York law recognizes a promissory estoppel claim based on the circumstances here. He contends that *Swerdloff* is erroneous and that the New York Court of Appeals and the Second Circuit have adopted a broader view of the doctrine.

In *Swerdloff*, which involved breach of an alleged oral contract and the application of the Statute of Frauds, the court specified two categories of cases in which reliance on a promise might give rise to a legal right of recovery. In the first, promissory estoppel is asserted as a substitute for consideration; in the second, the doctrine is invoked to bar the assertion of the Statute of Frauds.[27] Although *Swerdloff* related to a case which fell in the second category, the court noted that promissory estoppel as a substitute for consideration "has not been the law of New York, with narrow exceptions based on unusual circumstances."[28] The exceptions listed included a pledge of a charitable contribution, marriage settlements, a promise of a gift of land followed by the "donee" making substantial improvements thereon, a gratuitous bailee's promise to insure the bailed goods, and a promise by an insurance broker to pay certain premiums to prevent lapse of the policy.[29] Defendants rely upon this list of exceptions in support of their argument that the facts of this case do not support Murphy's promissory estoppel claim.

While neither the New York Court of Appeals, nor any other New York State court has adopted the *Swerdloff* view of promissory estoppel,[30] the Second Circuit does appear to recognize the existence of two *Swerdloff* categories. The court has held that when the doctrine is invoked to excuse compliance with the Statute of Frauds, it "is properly reserved for that limited class of cases where 'the circumstances are such as to render it *unconscionable* to deny' the promises upon which the plaintiff has relied", and that it requires the presence of substantial injury.[31] In addition, and most significant for the purpose of resolving this issue, the court has held that "[u]nder the doctrine of promissory estoppel a promise without any agreed consideration may be enforced if there has been a substantial change of position by the promisee in reasonable reliance upon the promise."[32] Unlike the *Swerdloff* court, however, the Second Circuit does not limit its application of promissory estoppel as a "consideration-substitute" to *Swerdloff*'s narrow categories.[33] For example, in *Schmidt v. McKay*[34] the court sanctioned a cause of action based upon this form of promissory estoppel where alleged promises were made to the

---

27. See *Swerdloff v. Mobil Oil Corp.*, 74 A.D.2d at 261, 427 N.Y.S.2d at 268–69.

28. *Id.*, 74 A.D.2d at 261, 427 N.Y.S.2d at 268.

29. See *id.*, 74 A.D.2d at 261 n.*, 427 N.Y.S.2d at 268 n.*.

30. Although defendants correctly argue that *Swerdloff* has been reaffirmed in *Tribune Printing Co. v. 263 Ninth Avenue Realty, Inc.*, 88 A.D.2d at 879, 452 N.Y.S.2d at 593, *aff'd*, 57 N.Y.2d 1038, 444 N.E.2d 35, 457 N.Y.S.2d 785 (1982), that case involved an attempt to employ promissory estoppel to excuse the Statute of Frauds. As the *Swerdloff* court recognized, and as is discussed below, a different standard applies to this category of promissory estoppel.

31. See *Philo Smith & Co. v. USLIFE Corp.*, 554 F.2d 34, 36 (2d Cir.1977), *quoting*, 3 WILLISON ON CONTRACTS § 533A, at 801 (3d ed. 1960) (emphasis added). *See also Grandonico v. Consortium Communications Int'l, Inc.*, 566 F.Supp. 1288, 1292 (S.D.N.Y.1983); *Mauala v. Milford Management Corp.*, 559 F.Supp. 1000, 1004 (S.D.N.Y.1983); *Republic Nat'l Bank v. Sabet*, 512 F.Supp. 416, 425–26 (S.D.N.Y.1980), *aff'd*, 681 F.2d 802 (2d Cir.1981), *cert. denied*, 456 U.S. 976, 102 S.Ct. 2241, 72 L.Ed.2d 850 (1982).

32. *Schmidt v. McKay*, 555 F.2d 30, 36 (2d Cir. 1977); *see also Garcia v. Von Micsky*, 602 F.2d 51, 53 (2d Cir.1979) (Oakes, J., dissenting); *Reprosystem, B.V. v. SCM Corp.*, 522 F.Supp. 1257, 1281 n. 11 (S.D.N.Y.1981), *rev'd on other grounds*, 727 F.2d 257 (2d Cir.1984).

33. See *Triology Variety Stores, Ltd. v. City Prods. Corp.*, 523 F.Supp. 691, 697 (S.D.N.Y.1981).

34. 555 F.2d 30 (2d Cir.1977).

plaintiff to credit his past years of service to his union pension.[35]

■ In this case, Murphy's cause of action for promissory estoppel is based upon the representations made by defendant Gutfreund that Murphy's work for Merrill Lynch was not in competition with Salomon Brothers. This claim requires finding a consideration-substitute to enforce Murphy's rights, and we hold that in light of the Second Circuit's opinion in *Schmidt*, New York law does not preclude Murphy from bringing his promissory estoppel claim. Defendants' motion to dismiss Murphy's fourth cause of action on this ground is therefore denied.

Defendants argue further that even if New York law does not prevent Murphy from asserting a promissory estoppel claim, his allegations do not satisfy the elements of a cause of action for promissory estoppel. The parties agree that the elements of promissory estoppel are: "a promise clear and unambiguous in its terms; reliance by the party to whom the promise is made, such reliance to be both reasonable and forseeable; the party asserting the estoppel must be injured by his reliance."[36]

■ Defendants claim that the promise made to Murphy was not clear and unambiguous because at the time representations were made to Murphy in 1980 the annuity agreement was not yet contemplated, and, under New York law, an estoppel "cannot arise from a promise as to future action with respect to a right to be acquired upon an agreement not yet made."[37] While defendants are correct,[38] the law further provides that "a representation as to the future can be held to be held to operate as an estoppel ... where it relates to an intended abandonment of an existing right, and is made to influence others, and by which they have been induced to act."[39] The New York Court of Appeals has pointed out that an estoppel

"is imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought."[40]

■ In this instance, defendants' representations to Murphy at the time he left Salomon Brothers to work for Merrill Lynch constituted an abandonment of their right to enforce the non-competition provision of the Salomon Brothers partnership agreement. As the pleadings reflect, these representations were at least partially responsible for inducing Murphy to leave Salomon Brothers and to join Merrill Lynch.[41] Moreover, the complaint is reasonably construed as alleging that at the time Murphy left Salomon, defendants intended to abandon any claim relating to the competitiveness of Murphy's work for Merrill Lynch's

**35.** *See supra* note 33.

**36.** *Triology Variety Stores, Ltd. v. City Products Corp.*, 523 F.Supp. 691, 696–97 (S.D.N.Y.1981), *quoting, James King & Son, Inc. v. DeSantis Constr. No. 2 Corp.*, 97 Misc.2d 1063, 1066, 413 N.Y.S.2d 78, 81 (Sup.1977). *See also Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 265 (2d Cir.1984).

**37.** Defendants' Reply Memorandum of Law, at 31, *quoting*, 21 N.Y.JUR. *Estoppel* § 27, at 39 (1961).

**38.** *See Insurance Co. v. Mowry*, 96 U.S. 544, 547, 24 L.Ed. 674 (1877), *quoted in, Witherell v. Kelly*, 195 A.D. 227, 231, 187 N.Y.S. 43, 46 (1921) and *Noble v. Niemiec*, 205 Misc. 785, 128 N.Y. S.2d 671, 675 (Sup.1954). *See also Metropolitan Life Ins. Co. v. Childs Co.*, 230 N.Y. 285, 294, 130

N.E. 295, 298 (1921) ("[A] truthful statement as to the present intention of a party with regard to his future acts is not the foundation upon which an estoppel may be built."); *LeBovici v. Jamaica Sav. Bank*, 81 A.D.2d 150, 439 N.Y.S.2d 688, 689 (1981), *aff'd*, 56 N.Y.2d 522, 434 N.E.2d 1332, 449 N.Y.S.2d 954 (1982).

**39.** *Insurance Co. v. Mowry*, 96 U.S. at 574, 24 L.Ed. 674. *See also* 21 N.Y.JUR. *Estoppel* § 27, at 38 (1961).

**40.** *Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 185, 436 N.E.2d 1265, 1270, 451 N.Y.S.2d 663, 667 (1982).

**41.** *See* Complaint ¶ 17, *supra* note 2.

real estate and mortgage insurance businesses.[42] As a result, in light of the fact that defendants sought to invoke the annuity agreement's non-competition provision only after Murphy assumed his position at Merrill Lynch, considerations of equity and fairness support the application of the estoppel doctrine against the defendants, if the facts pleaded in the complaint are true. We conclude that Murphy's pleadings are sufficient to warrant the denial of defendants' motion on this ground.

Defendants next contend that Murphy "does not and cannot allege reasonable and forseeable reliance." They assert that the events subsequent to October 1980, when Murphy left Salomon Brothers, were not forseeable by any party to this action and that it was unreasonable for Murphy to believe that the Salomon Brothers Executive Committee's failure to object to his employment with Merrill Lynch in October 1980 would affect future agreements. Murphy argues, in reply, that it was reasonable for him to expect that defendants would not take any action on the question of whether he was in competition with Salomon Brothers which would jeopardize his rights as a limited Salomon Brothers partner.

 The pleadings in fact allege that Murphy relied upon the representations of defendant Gutfreund when he decided to resign from Salomon Brothers and join Merrill Lynch,[43] and that he continued to believe that the terms of these representations remained in effect during discussions over the applicability of the annuity agreement's non-competition provision to his situation.[44] This pleading is sufficient to state a claim. The question of the reasonableness of plaintiff's reliance is a matter

of fact which cannot be determined on this motion.

As a final point on this matter—but by no means a final point on the motion—defendants claim that Murphy has not alleged detrimental reliance which is sufficient to support his claim. They argue that under New York law a change in jobs is insufficient detriment to call promissory estoppel into play. They assert further that Murphy has not made an adequate showing of reliance upon defendants' promise because any detriment which he incurred by leaving Salomon Brothers was not "unequivocally referrable" to any promise made to him by the defendants. Murphy answers that he has alleged sufficient detrimental reliance because he did not have to leave Salomon Brothers when he did, or he could have taken a position that raised no question of competition with Salomon Brothers.

 Defendants' arguments that Murphy must allege greater detriment than a mere change in jobs and that his detriment must be "unequivocally referrable" to the promises made to him by them are supported by the line of cases in which promissory estoppel has been employed as a defense to the Statute of Frauds.[45] Murphy's complaint, however, invokes promissory estoppel as a substitute for consideration,[46] thereby avoiding the more stringent pleading requirements which apply when the doctrine is invoked as a defense to the Statute of Frauds.[47] We find that Murphy's alleged change of jobs in reliance upon defendants' representations is sufficient to establish detrimental reliance in this instance. Accordingly, we find that Murphy has alleged the necessary elements of promissory estoppel.

---

**42.** In addition to the representation actually made to Murphy at the time he left Salomon Brothers, *see id.* ¶¶ 16 & 17, we consider significant the fact that defendant Gutfreund initially represented to Murphy that his work for Merrill Lynch would not affect his right to the annual annuity. See *id.* ¶ 24.

**43.** *Id.* ¶ 17.

**44.** *Id.* ¶¶ 24, 25 & 29.

**45.** *See supra* note 31 and accompanying text; *see also Ripple's of Clearview, Inc. v. Le Havre Assocs.,* 88 A.D.2d 120, 123, 452 N.Y.S.2d 447, 449 (1982).

**46.** *See* Complaint ¶ 48, *supra* note 2; Plaintiff's Memorandum of Law, at 36–37.

**47.** *See supra* text at notes 31–32.

Defendants' final argument for dismissing Murphy's fourth cause of action is that this claim falls within the terms of the release found in the annuity agreement. Murphy contends that the release provision does not apply in this instance because his promissory estoppel claim does not arise out of the Salomon Brothers dissolution, but from representations made to him more than one year before the dissolution and from the language found in the annuity agreement.

The annuity agreement's release provides, in relevant part:

"The Former General Partner [Murphy] hereby releases and discharges SBHC and Salomon Brothers and each and every partner and former partner of SBHC or Salomon Brothers, ... from any and all claims which the Former General Partner at any time had, has or may have for or by any reason of any matter, cause or thing whatever, arising out of or in any way relating to the dissolution, liquidation or termination of SBHC or Salomon Brothers, other than (i) any and all claims the Former General Partner may have against SBHC and Salomon Brothers to enforce his rights specifically set forth in this agreement...." [48]

 We find that the release agreement does not operate to extinguish the present claim since the present claim falls within exception (i) of the release because it is a claim to enforce Murphy's rights "specifically set forth" in the annuity agreement itself.

In light of the above findings, defendants' motion to dismiss the complaint's fourth cause of action is denied.

## VI.

### Count 5—Estoppel

Murphy's fifth cause of action asserts that having signed the annuity agreement fully aware of his employment and intent, defendants are estopped from claiming that his work for Merrill Lynch violated the agreement. [49]

Defendants move to dismiss this claim on the ground that it attempts to state a cause of action for equitable estoppel but fails to allege the necessary elements of such a claim. Murphy does not address defendants' arguments.

 We agree with defendants that the fifth cause of action purports to state a claim of equitable estoppel. As Chief Judge Motley has pointed out, "[e]quitable estoppel depends on a misrepresentation of existing fact". [50] Since the pleadings do not allege a misrepresentation of an existing fact by the defendants as a basis for this cause of action, defendants' motion to dismiss the complaint's fifth claim is granted without prejudice.

## VII.

### Count 6—Breach of Fiduciary Duty

The sixth cause of action alleges that defendants breached the fiduciary duty owed to Murphy in connection with the dissolution of Salomon Brothers at the time it was acquired by Phibro, and with respect to the application of the annuity agreement's non-competition provision to his situation. The complaint alleges that in adopting the dissolution plan for Salomon Brothers and SBHC, defendants did not "represent" the interests of the limited partners; [51] that they structured an agreement with Phibro that benefitted the general partners but worked to the considerable detriment of the limited partners; [52] that defendants arbitrarily and capriciously adopted an agreement for limited partners which imposed an unreasonable restraint of

**48.** Annuity Agreement, *supra* note 11, at 4–5.

**49.** *See id.* ¶ 52.

**50.** *Triology Variety Stores, Ltd. v. City Products Corp.,* 523 F.Supp. 691, 697 n. 3 (S.D.N.Y.1981); *see also Special Event Entertainment v. Rocke-feller Center, Inc.,* 458 F.Supp. 72, 76 (S.D.N.Y. 1978).

**51.** *See* Complaint ¶ 56, *supra* note 2.

**52.** *See id.* ¶ 57.

trade upon them; [53] that the condition in the agreement restricting employment discriminates against Murphy; [54] that defendants breached their fiduciary duty by informing Murphy no exceptions would be made to the agreement and by then entering into a secret agreement with another limited partner who had been a general partner effectively excusing him from the employment restriction; [55] and that, because defendants were aware at all times of his position at Merrill Lynch and that he had only taken the position only after receiving assurances that he was not in competition with Salomon Brothers,[56] they acted in bad faith through the drafting and signing of the agreement.

Defendants move to dismiss this claim on the grounds that Murphy received more than what he was entitled to receive under the SBHC limited partnership agreement when his limited partnership status and the Salomon Brothers partnership were terminated, that under New York law a limited partner has no right to receive anything beyond what is found in the limited partnership agreement, and that this claim falls within the annuity agreement's release provision.

Defendants assert that the annuity is a gift and that a gift cannot be the basis of a breach of fiduciary duty claim. We hold that this ground does not support a dismissal of Murphy's cause of action because it has been determined above that the annuity was not a gift.[57] We also find that the complaint makes out at least one proper allegation of breach of fiduciary duty.

Among the examples of defendants' lack of good faith discussed by Murphy is defendants' attempt to impose a non-compete provision upon Murphy when they were aware that he had received representations

from them that his Merrill Lynch position was not in competition with Salomon Brothers. Defendants argue that even if Murphy's allegations are accepted as true, no one "imposed" the annuity agreement on him, and whatever was said to Murphy at the time he left Salomon Brothers could not conceivably relate to the unforseeable circumstances of Salomon Brothers' subsequent dissolution and the Phibro transaction. In support of their contentions, defendants cite their argument, which we have rejected above, that Murphy has failed to allege the elements of promissory estoppel.

Judge Weinfeld has noted that "the fiduciary duty of fair dealing owed by a general partner to a limited partner is no less than that owed by a corporate director to a corporate shareholder," [58] and the Second Circuit court of appeals has held that a partnership may even continue to owe a withdrawn general partner duties of good faith, fairness and loyalty in dealings regarding the partnership business.[59]

■■■ As a former general partner and limited partner of Salomon Brothers at the time the annuity was contemplated and drafted, Murphy was owed a fiduciary duty of fair dealing by defendants with respect to the terms found in the annuity agreement. In addition, we find that Murphy has adequately alleged a breach of fiduciary duty insofar as the alleged facts show that the annuity agreement's non-competition provision was applied to him after he had received assurances from the defendants that his situation at Merrill Lynch was not competitive with the business of Salomon Brothers. Defendants' arguments that they did not "impose" the annuity upon Murphy and that the Phibro transaction was "unforseeable" do not affect this

---

**53.** See id. ¶ 58.

**54.** See id.

**55.** See id.

**56.** See id.

**57.** See supra text at page 962.

**58.** Miller v. Schweickart, 405 F.Supp. 366, 369 (S.D.N.Y.1975), citing, Riviera Congress Assocs. v. Yassky, 18 N.Y.2d 540, 547, 223 N.E.2d 876, 880, 277 N.Y.S.2d 386, 392 (1966).

**59.** See Newburger, Loeb & Co., Inc. v. Gross, 563 F.2d 1057, 1078 (2d Cir.1977), cert. denied, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978).

conclusion because Murphy has adequately alleged the element of forseeability,[60] and an absence of fair dealing on defendants' part.

Although the complaint contains legally sufficient allegations of breach of fiduciary duty with respect to defendants' drafting of the annuity agreement, and its application to Murphy, we agree with defendants that the complaint fails to allege such a breach with respect to events surrounding the dissolution of the Salomon Brothers. Murphy contends that the complaint alleges, in effect, self dealing by the defendants because of the substantial profits they received (ranging from $16 to $32 million) at the time of the dissolution. While these sums are unquestionably staggering, Murphy has not alleged that defendants acted outside the terms of any of the agreements governing the winding up of Salomon Brothers or the operation of the SBHC limited partnership, and he is therefore precluded from alleging a breach of fiduciary duty with respect to the dissolution.[61]

Defendants' final ground in support of dismissal of this cause of action is that any fiduciary breach claim is barred by the annuity agreement's release provision. We do not find this argument persuasive, however, because New York law does not sanction use of releases in order to avoid a breach of fiduciary duty cause of action.[62] Accordingly, defendants' motion to dismiss the complaint's sixth claim is denied.

## VIII.

### Count 7—Violation of the Federal Securities Laws

Murphy's last claim is that defendants' actions violated Section 10(b) of the Securities Exchange Act of 1934 [63] and SEC Rule 10b-5.[64] It is dismissed. The complaint specifies two alleged misstatements by defendants: that it was necessary for all limited partners who had been general partners to sign the annuity agreement and comply with its terms, and that no exceptions would be made.[65] It is said that the defendants intended these statements to be false and misleading because they knew that the annuity agreement's non-competition provision was unnecessary to the business of Salomon Brothers, and because defendants made an exception to the above-stated requirement by negotiating a separate agreement with at least one other limited partner who had been a general partner.[66]

Defendants move to dismiss this cause of action on the authority of *Fershtman v. Schectman.*[67] In *Fershtman*, the court affirmed the dismissal of a suit brought under Rule 10b-5 by limited partners suing, individually and derivatively, their general partners. The general partners had elected to terminate the limited partnership pursuant to the terms of the partnership agreement. The limited partners alleged violations of the federal securities laws as a result of the partners' misrepresentations and nondisclosure of information in connection with the limited partners' purchases of

60. *See supra* text at pages 965–966.

61. *See Riviera Congress Assocs. v. Yassky,* 18 N.Y.2d at 548, 233 N.E.2d at 880, 277 N.Y.S.2d at 392–93 ("partners may include in the partnership articles practically 'any agreement they wish' "), *quoting, Lanier v. Bowdoin,* 282 N.Y. 32, 38, 24 N.E.2d 732, 734 (1939). *See also Fershtman v. Schectman,* 450 F.2d 1357, 1359 & n. 1 (2d Cir.1971), *cert. denied,* 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972).

62. *See Rockwood Computer Corp. v. Morris,* 94 F.R.D. 64, 68–69 (E.D.N.Y.1982) (discussing cases); *Auld v. Estridge,* 86 Misc.2d 895, 908–09,

382 N.Y.S.2d 897, 906 (Sup.1976), *aff'd mem.,* 58 A.D.2d 636, 395 N.Y.S.2d 969 (1977).

63. 15 U.S.C. § 78j(b).

64. 17 C.F.R. § 240.10-b-5 (1983). *See* Complaint ¶ 70, *supra* note 2.

65. *See* Complaint ¶ 71, *supra* note 2.

66. *See id.*

67. 450 F.2d 1357 (2d Cir.1971), *cert. denied,* 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972).

interests in the partnership.[68] Defendants emphasize Judge Friendly's ruling that the limited partners failed to state a claim because it made no difference if the general partners had misrepresented or concealed information since they were legally entitled to terminate the partnership.[69] Defendants contend that because they were empowered by the terms of the partnership agreement to terminate the interests of the Salomon Brothers limited partners, as in *Fershtman*, it makes no difference whether they misrepresented or concealed.

Murphy responds that his cause of action is supported by the Second Circuit's holding in *Goldberg v. Meridor*.[70] In that case, a derivative suit brought by a minority shareholder in a subsidiary corporation against the parent corporation for violations of Section 10(b) of the Securities Exchange Act, SEC Rule 10b–5, and breach of common law fiduciary duties which arose from a contract involving a transfer of the parent's assets, the court overturned the district court's decisions granting motions to dismiss the federal claims and denying leave to amend the complaint. The defendants had contended that even if the complaint, as amended, alleged non-disclosures and misrepresentations of public information regarding the disputed transaction, these allegations would not support the federal cause of action because there was no requirement that the stockholders approve the transaction.[71] Judge Friendly, however, found that the plaintiff could plead the federal claim if he would have been in a position to have obtained injunctive relief had the defendants not lulled him into a position of security through deceptive disclosure.[72]

Murphy asserts that the *Goldberg* rationale controls here because the complaint alleges that the defendants breached the fiduciary duty owed to him when they applied the annuity agreement's non-competition provision to his situation and because defendants made false and misleading statements to Murphy designed to avoid litigation, to induce him into signing the annuity agreement, and to "lull" him into the security of believing that defendants had treated and would treat other Salomon Brothers limited partners similarly.

Defendants' reply that *Goldberg* is irrelevant because it was a derivative action brought on behalf of a corporation which was held to be deceived as a seller of securities. In this case, they argue, Murphy had no investment decision to make, the termination of his limited partnership interest was effected by the general partners under their rights specified in the partnership agreement, and, as in *Fershtman*, it would make no difference whether they misrepresented or concealed. They add that the complaint does not allege that Murphy was misled into foregoing an available state injunctive remedy, as required by *Goldberg*, and that no such remedy was available to him under New York law.

The question whether *Fershtman* or *Goldberg* applies to this case is illuminated by the Second Circuit's recent decision in *Mayer v. Oil Field Systems Corp.*[73] *Mayer*, like the case at hand, was a suit by a limited partner against general partners for violations of Section 10(b) of the Securities Exchange Act and Rule 10b–5.[74] The complaint alleged that the limited partnership agreements provided that the limited

**68.** *Id.* at 1359.

**69.** *See id.* at 1359–60.

**70.** 567 F.2d 209 (2d Cir.1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978).

**71.** *See id.* at 218.

**72.** *See id.* 567 F.2d at 220. Judge Friendly further noted that the plaintiff would have to show " 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly al-

tered the "total mix" of information made available.' " *Id.* at 218–19, *quoting, TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). *See also Madison Consultants v. FDIC,* 710 F.2d 57, 62–63 (2d Cir.1983); *Bolton v. Gramlich,* 540 F.Supp. 822, 837 & n. 20 (S.D.N.Y.1982).

**73.** 721 F.2d 59 (2d Cir.1983).

**74.** *See id.* at 62.

partners would be repaid in full before the general partners received any payment; that the general partners engaged in a scheme to circumvent these provisions by paying back the limited partners with stock of artificially inflated value which permitted the general partners to share wrongfully in the pay back; that the defendants omitted to disclose this information in the documents they filed with the SEC; and that the defendants caused correspondence containing false and misleading statements or material omissions [75] to be distributed to the limited partners.

The district court dismissed the action on the ground that the limited partner lacked standing to sue under the federal securities laws.[76] On appeal, the general partners argued that the limited partners could not have prevented the transaction since all powers over the assets of the partnerships in question were vested in the general partners.[77]

In reversing the district court's dismissal, Judge Friendly found, in effect, that a limited partner had standing on his own, rather than derivatively, to maintain a cause of action under the federal securities laws.[78] This disposition rebuts defendants' claim that *Goldberg* does not apply in this instance because it is limited to the class of actions brought as derivative suits.

Judge Friendly also found that the limited partner had standing to sue under the federal securities laws because the courts have recognized limited partnership interests to be securities where the investing limited partners exercise no managerial role in the partnership's affairs, and where there are a considerable number of limited partners.[79] The rationale is significant in this case because it discounts defendants' effort to distinguish *Goldberg* on the ground that Murphy had no investment decision to make. The SBHC limited partnership agreement specified, for example, that "[t]he partnership shall be managed solely by the general partners." [80] In addition, there were a sufficient number of Salomon Brothers limited partners to conclude that Murphy's limited partnership interest was a security within the meaning of the federal securities laws.[81]

Finally, Judge Friendly reaffirmed his *Goldberg* holding by finding that even where the assent of the limited partners is not required to carry out the relevant transactions, a cause of action by a limited partner is cognizable under Section 10(b) when plaintiffs "prove the existence of a means of self-protection by showing that they could have pursued some available state remedy if they had not been deceived", and where they show by a preponderance of the evidence not merely that an available state court remedy existed but that they would have succeeded in preventing the loss they in fact suffered.[82]

Inasmuch as Murphy's complaint does not allege that he would have succeed-

**75.** *See id.* at 61–62.

**76.** *See id.* at 62.

**77.** *See id.* at 66. The partnership agreements provided that the general partner was exclusively to manage and control the business of the partnership and make all decisions affecting their affairs, and that no general partner shall take part in the management of the partnership's affairs or transact any business for the partnership. *See id.* at 63.

**78.** *See id.* at 67 & n. 8.

**79.** *See id.* at 65, *citing, SEC v. W.J. Howey Co.,* 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946); *SEC v. Aqua-Sonic Products Corp.,* 687 F.2d 577, 581–84 (2d Cir.), *cert. denied,* 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982); *SEC v. Murphy,* 626 F.2d 633, 640–41 (9th Cir. 1980); *Goodman v. Epstein,* .582 F.2d 388, 406–08 (7th Cir.1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979); *Hirsch v. duPont,* 396 F.Supp. 1214, 1227–28 (S.D.N.Y. 1975), *aff'd,* 553 F.2d 750 (2d Cir.1977).

**80.** Limited Partnership Agreement § 4(a), at 2, *reprinted in,* Affidavit of Donald M. Feurstein, filed Aug. 13, 1982, at Ex. B.

**81.** *See id.* § 5(b), at 3–4 (listing 29 limited partners).

**82.** *Mayer v. Oil Field Services Corp.,* 721 F.2d at 67 & n. 7, *quoting, Madison Consultants v. FDIC,* 710 F.2d 57, 63 (2d Cir.1983). *See also Santa Fe Indus. v. Green,* 430 U.S. 462, 474 n. 14, 97 S.Ct. 1292, 1301 n. 14, 51 L.Ed.2d 480 (1977); *Goldberg v. Meridor,* 567 F.2d at 218–20.

ed in preventing the loss he in fact suffered, defendants' motion to dismiss his seventh cause of action is granted without prejudice.

For the foregoing reasons, defendants' motion to dismiss is granted, as to the complaint's first, third, fifth and seventh claims, and is denied as to the remaining claims.

It is so ordered.